**183**
Michael St. James, CSB No. 95653
ST. JAMES LAW, P.C.
155 Montgomery Street, Suite 1004
San Francisco, California 94104
(415) 391-7566 Telephone
(415) 391-7568 Facsimile
michael@stjames-law.com

Robert J. Yorio (SBN 93178)
CARR & FERRELL *LLP*
120 Constitution Drive
Menlo Park, California 94025
Telephone No.: (650) 812-3400
Facsimile No.: (650) 812-3444
yorio@carrferrell.com

Attorneys for
PRABHAKAR GOEL and
GOEL FAMILY VENTURES I LP

## UNITED STATES BANKRUPTCY COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re | ) | Case No. 18-23885 |
| | ) | Chapter 13 |
| | ) | |
| JASPAL SINGH DEOL | ) | DATE: September 11, 2018 |
| | ) | TIME: 2:00 p.m. |
| Debtor. | ) | JUDGE: Honorable Christopher Klein |
| | ) | DCN: STJ-1 |
| | ) | |

### EXHIBITS TO
### REQUEST FOR JUDICIAL NOTICE MOTION TO DISMISS CASE

DATED: August 7, 2018          CARR & FERRELL, LLP
                               ST. JAMES LAW, P.C.


                               By:  /s/ *Michael St. James* .
                                    Michael St. James
                               Counsel for PRABHAKAR GOEL and
                               GOEL FAMILY VENTURES I LP

# Exhibit

# A

# JAMS ARBITRATION
## Case No. 1110016365

PRABHAKAR GOEL, an individual;
and GOEL FAMILY VENTURES I LP,
a limited partnership,

                 Claimants,

   vs.

ECONERGY, INC., a California
Corporation, and JASPAL SINGH DEOL,
an individual,

                 Respondents.

ECONERGY, INC., a California
Corporation, and JASPAL SINGH DEOL,
an individual,

                 Counter-Claimants,

   vs.

PRABHAKAR GOEL, an individual;
and GOEL FAMILY VENTURES I LP,
a limited partnership,

                 Counter-Respondents.

## PARTIAL FINAL AWARD (CORRECTED[1])

---

[1] The Partial Final Award issued herein on June 16, 2017, has been corrected to apply, whenever called for by that Award, the correct Rupee to Dollar exchange rate in effect on June 15, 2017, i.e., 64.58 ₹/$.

**Exhibit A**

# CONTENTS

                                                                      Page

I.  PROCEDURAL BACKGROUND                                              4

II. FACTS                                                             7

III. SUMMARY OF CLAIMS                                               24

IV. RELIEF REQUESTED                                                 26

V. DISCUSSION/CONCLUSIONS                                            28

    1.  Did Goel commit any breaches of fiduciary
    duty *prior to* entering into the Co-Development
    Agreement?                                      28

    2.  Is the Loan Agreement voidable by Econergy or
    Deol due to duress in the making?                30

    3.  Even if the Loan Agreement is not voidable due to
    duress, are some or all of its terms unenforceable
    due to unconscionability?                        31

    4.  Was the interest rate in the Loan Agreement
    usurious?  If so, what remedy should flow from
    that fact?                                       34

    5.  Did Goel fail to complete the project in a timely
    manner?                                          36

    6.  Did Goel fail to execute the project "per IREDA
    and PEDA requirements"?                          38

    7.  During construction, did Goel misappropriate
    Econergy's materials for use on his other projects?  39

    8.  Was Goel deficient in his director duties by making
    the decision to abandon the custom-made riveted
    nuts at the German airport?                      40

    9.  Did Goel misallocate the work time of the shared
    project personnel?                               40

    10. During construction, did Goel fail to act in a
    consensus manner with Deol?                      40

PARTIAL FINAL AWARD (CORRECTED)

**Exhibit A**

11. Was Goel at fault if the plant produced below the
parties' expectations?                                          41

12. Did Goel properly perform his duties, as a director,
in response to the plant performance issues that
arose in 2012?                                                  42

13. Did either Goel or Deol fail to meet their obligations
regarding obtaining a CLU for Deol's land?                      43

14. Did either party breach its obligations under the
option to purchase after GFV exercised that option?             44

15. Did Deol adequately account for the $31,000 of
claimed expenses for which he received a credit
against his equity requirement?                                 44

16. Is Deol liable to Econergy for the interest received
on the IREDA bank guarantees?                                   45

17. Did Goel fail to adequately account to Econergy
and Deol for construction costs and for the advances
Goel made to Econergy?                                          45

18. Was Deol justified, because of any of Goel's actions,
in taking the actions he took beginning in March of 2013,
to take control over Econergy and cause Econergy to
default on its loan payments to Goel?                           45

19. Following the events of early 2013, has Deol engaged
in actions that violated his fiduciary duties to Goel and
to Econergy?                                                    47

VI. RELIEF ORDERED IN THIS CORRECTED PARTIAL FINAL AWARD    48

VII. FURTHER PROCEEDINGS                                        52

/ / / / / / /

/ / / / / / /

/ / / / / / /

/ / / / / / /

Exhibit A

THE UNDERSIGNED, having been duly appointed as the Arbitrator, and having examined the submissions, proofs and allegations of the parties, finds, concludes, and issues this Corrected Partial Final Award, determining all liability issues arising from the parties dealings under the Project Co-Development and Investment Agreement and the Loan Agreement, awarding damages on certain of those liabilities, and establishing the process for determining damages on the remaining liability issues through the use of an independent accountant.

## I. PROCEDURAL BACKGROUND

A.    Parties and Counsel. The parties to this arbitration are identified in the above caption and are represented as follows:

For Claimants/Counter-Respondents Prabhakar Goel and Goel Family Ventures I LP:

> Robert J. Yorio, Esq.,
> Christine S. Watson, Esq.
> Carr & Ferrell LLP
> 120 Constitution Drive
> Menlo Park, CA 94025
> (650) 812-3400          (650) 812-3444 (fax)
> yorio@carrrferrell.com
> cwatson@carrferrell.com

For Respondents/Counter-Claimants Econergy, Inc., and Jaspal Singh Deol:

> Kathleen E. Finnerty, Esq.
> Laurel Edgeworth, Esq.
> Finnerty Law Offices, Inc.
> 1430 Blue Oaks Blvd., Suite 140
> Roseville, CA 95747
> (916) 415-7070
> KFinn@KFinnertyLaw.com

B.    Arbitrator.  The parties selected, as sole arbitrator:

> Hon. Robert A. Baines (Ret.)
> JAMS
> 160 W. Santa Clara Street, Suite 1600
> San Jose, CA 95113
> (408) 288-2240          (408) 295-5267 (fax)
> rbaines@jamsadr.net

**Exhibit A**

C.     Arbitrator's Case Manager:

> Cynthia Victory
> JAMS
> 160 W. Santa Clara Street, Suite 1600
> San Jose, CA 95113
> (408) 346-0736       (408) 295-5267 (fax)
> cvictory@jamsadr.com

D.     Agreement to Arbitrate:

The parties' agreement to arbitrate disputes is contained in two documents: (1) a "Project Co-Development and Investment Agreement" dated on or about June 7, 2011, at Paragraph 14, and (2) Article 7.1 of the "Loan Agreement" dated on or about November 27, 2011 (collectively "the Agreements").

All parties agree that the disputes presented for resolution herein were subject to the binding arbitration provisions of those Agreements.

E.     Commencement of Arbitration:

Claimant's Demand for Arbitration was received by JAMS on or about December 3, 2013.

The arbitration was formally commenced by JAMS on January 15, 2014, with the sending of the "Commencement of Arbitration" letter to all parties. On January 31, 2014, the undersigned was appointed as the Arbitrator, and the JAMS "Appointment of Arbitrator" letter was sent to all parties on that date. The Arbitrator's written disclosures were sent to all parties on that same date.

F.     Applicable Law and Rules:

Substantive Law: Although both Agreements involve an enterprise undertaken in India, the Agreements were made in California. Also, the Loan Agreement specifically provides: "This Agreement shall be governed and construed in accordance with the laws of the State of California." California substantive law has been applied.

Rules: The JAMS Comprehensive Arbitration Rules ("Rules") were applied to these proceedings.

G.     Claims of the Parties:

Claimant Goel initially filed only individual claims on or about December 2, 2013. Subsequently, claims on behalf of Goel Family Ventures I LP were added. The currently operative claims (by both Goel and Goel Family Ventures I LP) are

**Exhibit A**

those described in their First Amended Complaint in Arbitration, dated on or about January 7, 2015. These amended claims essentially are for Breach of the Co-Development Agreement, Breach of the Loan Agreement, and Breach of Fiduciary Duty. Respondents filed their Responses to these amended claims on or about February 2, 2015.

On December 9, 2014, Respondents filed Counter-Claims in this matter. These Counter-Claims are for Breach of Fiduciary Duties, breach of the express terms of both the Co-Development Agreement and the Loan Agreement, and for Conversion. Counter-Respondents filed their responses to these Counter-Claims on or about January 7, 2015. The Counter-Claims were subsequently amended in April of 2016 to add claims of breach of the implied covenant of good faith and fair dealing, and for usury. These amended Counter-Claims were deemed denied without the need for a written response. [Rule 9(e)]

The Claims and Counter-Claims are outlined in Section III, and discussed in detail in Section V, below.

There is no dispute that all claims and counter-claims lodged herein are within the scope of the parties' agreements to arbitrate.

II.    The Arbitration Hearing:

The arbitration hearing took place over eleven days[2] at the JAMS Silicon Valley Resolution Center, 160 W. Santa Clara Street, Suite 1600, San Jose, California.

Seven witnesses testified in person;[3] four additional witnesses appeared by way of deposition testimony.[4] The proceedings were reported and a transcript prepared.

A number of exhibits were admitted either by stipulation of counsel or order of the undersigned.

Post-hearing briefing was completed on February 2, 2017, and oral arguments heard on February 24, 2017. Following oral arguments, and pursuant to Rule 22, the undersigned requested certain additional evidence, i.e., solar plant output as reported to IREDA for all plants in the initial RPSSGP program. The undersigned also asked counsel for additional input as to which issues were to be resolved in the initial Partial Final Award without use of the independent accounting, and which should require use of the accountant. These matters, and others, were

---

[2] June 13, 14, 29, and 30; July 21 and 22; August 15 and 16; October 19 and 20; and November 7, 2016.

[3] Alphabetically: Surinder Bedi, Brittney Blackburn, Jaspal Singh Deol, Pooneet Goel, Prabhakar (Prabhu) Goel, Monica Ip, and Forest Vickery.

[4] Alphabetically: Neelkant Gargya, Vijay Goel, Anmol Jaggi, and Klaus Müller.

PARTIAL FINAL AWARD (CORRECTED)

**Exhibit A**

discussed with counsel on April 13, 2017, and additional materials furnished thereafter.

The case was then submitted for decision on May 22, 2017. [Submittal Order, May 22, 2017].

## II. FACTS

*The following is a statement of facts found by the Arbitrator to be true and necessary for this Corrected Partial Final Award. To the extent this recitation differs from any party's position, that is the result of the Arbitrator's resolution of the factual disputes, including making necessary determinations as to the credibility of witnesses and the relevancy of evidence, as well as determinations of the burden of proof, and an overall weighing of the evidence, both oral and written.[5]*

This matter is the unfortunate saga of two seasoned entrepreneurs, Prabhakar Goel ("Goel") and Jaspal Singh Deol ("Deol"), coming together to build a solar power plant in the state of Punjab, India, and ending up in a contentious and long-running battle for control of that plant and its revenues.

Goel and Deol first met in California in late 2009 or early 2010. Each was already involved in energy production ventures worldwide, including solar. Goel, with a doctorate in electrical engineering, had been very successful in the high-tech world, first at several well-known companies and then with his own company. After selling that company, he became primarily an "angel investor," with an interest in solar energy ventures.

Deol, a long-time electrical engineer for the Sacramento Municipal Utilities District, also engaged in private business ventures in the energy field. In 2009 he had formed his own energy development corporation, Econergy, Inc. ("Econergy"). In a 2010 document, Econergy listed its two principals as Deol (CEO) and Dirk Vollbrecht (CTO/CFO) and described their vast experience in solar projects worldwide: "ECONERGY's team consists of highly skilled and experienced professionals with a solid track record of over 150 turnkey PV Solar power projects implemented, totaling >75 MW capacity and investments of about 425 Million EUR." [#1726]

Shortly before Goel and Deol met, the Indian government had announced a major solar power initiative -- the Jawaharlal Nehru National Solar Mission ("Solar Mission"). The Solar Mission included a program known as the Rooftop Photovoltaic and Small Solar Power Generation Programme ("RPSSGP"), the goal of which was to encourage the building of modest-scale (1 to 2 MW capacity) solar plants throughout India. The incentive offered to prospective developers was a very attractive, government-subsidized,

---

[5] Whenever reference is made to an exhibit, it will be by exhibit number only, in brackets, e.g., [#1].

**PARTIAL FINAL AWARD (CORRECTED)**

**Exhibit A**

price (tariff) for solar-produced electricity. To participate in the RPSSGP program, solar plant developers needed to be approved ("certified") by the Indian Renewable Energy Development Agency ("IREDA") before building a plant.

Both Goel and Deol had relatives and connections in India, and both were interested in participating in the RPSSGP program, either separately or jointly. Each began exploring various projects under that program. In early April of 2010, in anticipation of doing joint projects, Econergy and one of Goel's investment entities, the Goel Family Group, LLC, entered into a one-page agreement entitled "Agreement for Solar Farm Projects in India." [#1811] That Agreement contained few specifics, but it did indicate that the two entities would be "bidding as a consortium for setting up solar farms in India." The Agreement called for the two entities to finalize, by the end of April, an Operating Agreement that would "govern any and all activities undertaken jointly by the two parties in the solar farms area in India." An Operating Agreement, however, did not materialize for another fourteen months. The Agreement for Solar Farm Projects in India also recognized that the parties were free to pursue their own separate solar projects.[6]

One of the projects Deol was exploring was a 1 to 2 MW solar plant near the village of Boparai Kalan, District of Ludhiana, State of Punjab, where he had relatives and other contacts ("Ludhiana project"). Deol and Goel discussed the possibility of doing the Ludhiana project as one of their joint endeavors.

IREDA announced the guidelines for RPSSGP applicants in June of 2010. Applications were due by mid-July, with a short-list of approved projects to be announced by mid-August. Final approvals would be made by mid-September. As part of the approval process, applicants had to obtain pre-registration from their state's energy agency. In the state of Punjab, that agency was the Punjab Energy Development Agency ("PEDA"). Once a project was short-listed by IREDA, the proponent needed to enter into a contract with a local utility company to sell solar-generated electricity to that utility (a "Power Purchase Agreement").

Econergy obtained pre-registration from PEDA for its Ludhiana project in early July of 2010, and submitted its application to IREDA. Econergy was short-listed by IREDA in mid-August, and thus on August 18, 2010, Econergy entered into a Power Purchase Agreement with the local utility, the Punjab State Power Company, Ltd. ("PSPCL"). [#1604]

Because Deol and Goel had not finalized an Operating Agreement for any joint projects, the Ludhiana project initially was pursued as an Econergy project. The applications to PEDA and IREDA, as well as the Power Purchase Agreement, were solely in Econergy's name and made no mention of a partnership with the Goel Family Group LLC or any other entity.

---

[6] The Agreement for Solar Farm Projects in India also indicated that they had submitted a Joint Development Agreement to the Punjab Energy Development Agency ("PEDA"). That Joint Development Agreement, however, was not produced in evidence, and if it existed, its terms are unknown.

PARTIAL FINAL AWARD (CORRECTED)

**Exhibit A**

Also, although Econergy represented to PEDA that it had "full control" of the land needed for the proposed farm [#1726], Econergy had not acquired any land at that point. Deol's plan was to obtain IREDA approval first, and then have Econergy buy or lease the needed land, with the acreage dependent on the size of the plant approved by IREDA.

In addition to land acquisition costs, Doel estimated that construction of a 1 MW solar farm would require between $2 million and $3 million for materials and labor. [#1726].[7] Doel, however, did not intend for Econergy to fund the entire project itself. Rather, he hoped to find financial backers, either equity partners or commercial lenders. One such possibility was a Goel investment entity.

As part of the application process under the RPSSGP program, each project proponent was required to furnish IREDA performance incentives, in the form of bank guarantees. Specifically, IREDA required five bank guarantees, each in the amount of 1 million Rupees (approximately $22,000 each[8]) from all project applicants. These bank guarantees were, in essence, held captive by IREDA to encourage timely completion of the plant. The proponent had one year to build and commission its plant. If done within that time frame, all five bank guarantees would be returned, together with accrued interest. However, if the plant was not commissioned by the end of one year, the project had an additional six months to come on-line, but would lose one bank guarantee at the start of each subsequent two-month interval. Then, if the project was not on-line by the end of those extra six months [i.e., by the end of eighteen months from project approval], the remaining two bank guarantees would be forfeited, and the project would lose its favorable tariff for selling electricity. Deol, as part of Econergy's IREDA application, had purchased the required five bank guarantees in August 2010, and submitted them to IREDA.

During the time that Econergy was pursuing approval for its Ludhiana project, Goel was involved with three other RPSSGP projects, each done in conjunction with a different Indian company.[9] Nonetheless, Goel and Deol continued to work toward a possible joint arrangement for Econergy's Ludhiana project; in August 2010, one of Goel's other entities, the Goel Family Ventures I LP ("GFV") agreed to transfer $87,500 to Deol's personal bank account. This represented the bulk of the cost of the five bank

---

[7] Deol's plan was for Econergy to hire an EPC (Engineering, Procurement and Construction) contractor to design the plant, procure the necessary materials, and build the plant. The result would be a turnkey-ready plant that Econergy would operate.

[8] Whenever Rupees are converted to U.S. dollars in this Award, the undersigned has used the historic conversion rates for the date(s) in question, as reported on the website "x-rates.com." Whenever a specific conversion rate is noted in this Award, it will be shown in brackets as Rupees per Dollar, e.g., [66 ₹/$].

[9] One in the state of Punjab, near Muktsar (a 1.5 MW plant sponsored by Carlill Holding Private, Ltd.,); one in the state of Orissa near Sonepur (a 1 MW plant promoted by Abacus Holdings Private, Ltd.); and one in the state of Uttarakhand near Roorkee, (a 1 MW plant promoted by Metro Frozen Foods and Vegetables Private, Ltd.).

**Exhibit A**

guarantees Deol had purchased for Econergy's IREDA application.[10]   However, because the parties still did not have an Operating Agreement for a joint venture, this transfer was considered either a loan to Deol (in the event no joint project went forward), or a capital contribution by GFV (in the event a joint project went forward).  As Doel wrote at that time: "The funds will be turned into joint venture project equity depending on an establishment of a mutually agreed upon project participation agreement.  Should the joint venture not come to fruition between Mr. Deol and Mr. Goel or the project not proceed due to Indian governmental rejection of the application or lack of clearance from appropriate Indian regulatory agencies, the funds for the said project shall be construed as a loan and promptly returned to Mr. Goel less shared expenses for the development of the said project." [#1603]

In response to Deol's email, Goel reminded Deol that they already had a project participation agreement (i.e., the "Agreement for Solar Farm Projects in India"), but, under that Agreement, they still needed to enter into an Operating Agreement before they could move forward on any joint project: "The part remaining is to execute the Operating Agreement relating to how we will work together on solar projects in India." [#1603]

On September 17, 2010, IREDA announced the approved projects for the first round of solar plants under the RPSSGP.  Seventy-two projects across India were approved, including Econergy's Ludhiana project and Goel's three projects.

After IREDA's approval, each of these projects was governed by the same time constraints: each had one year, until September 16, 2011, to build its plant and connect to the grid, to avoid loss of any of its bank guarantees.  If not on-line by that initial deadline, one bank guarantee would be forfeited at the start of each two-month interval thereafter (i.e., one bank guarantee would be forfeited on September 17, 2011, one on November 17, 2011, and one on January 17, 2012).  If the plant was not on-line by March 16, 2012, the remaining two bank guarantees would be forfeited, along with the favorable tariff for selling power to a local utility.

Following IREDA's approval of Econergy's Ludhiana project, Goel and Deol continued to discuss whether to convert that project into a joint one.  For example, five months later (January of 2011) Goel sent Deol a proposed "Equity Investment Agreement."  [#1789]  Deol forwarded this proposal to his attorney in February [#1790], but it was never executed, for reasons not clear from our evidence.

Also, at times, Goel offered suggestions on resources that might assist Deol in developing the Ludhiana plant.  In January 2011, Goel suggested that the Spanish EPC contractor Goel had used on a recent solar project could be of assistance: "The installation and system design team from Spain is available to us to help in any way needed."  [#1786]

---

[10] The cost of the five 1 million Rupee bank guarantees in mid-August of 2010 was approximately $107,500, of which Deol paid $20,000 and GFV paid $87,500.

**PARTIAL FINAL AWARD (CORRECTED)**

**Exhibit A**

However, even as late as March 2011, Deol was still exploring other possible funding partners for the Ludhiana project, and apparently was reluctant to commit to having Goel as Econergy's partner for that project. [#312]

Also, in 2011, Deol had moved ahead on his own to acquire land for Econergy's Ludhiana project. By early April, he had acquired, in his own name, a little over 10 acres.[11] [#1611] He had purchased the land from a number of families for approximately $600,000.[12] Evidently he had bargained well; he later told Goel the land was worth more than he had paid for it.

Soon after acquiring the land, Deol leased it to Econergy for 25 years at 1,865,220 Rupees per year (approximately $42,000/year at that time). The rent payments would start once the plant was commissioned and revenue came to Econergy under the Power Purchase Agreement.

In early May of 2011, Deol registered Econergy as a foreign corporation doing business in India as a "Project Office." That status allowed Econergy to lawfully conduct business in India. It also required Econergy to make certain official fillings, including tax returns.[13]

In mid-May, Goel forwarded to Deol a proposal from an EPC contractor, Staten Solar India Pvt., Ltd. ("Staten"), for Econergy's Ludhiana project. Staten proposed to use Goel's Spanish EPC contractor, Tejados Industriales de Fotovoltaica ("TIF"), for the engineering work, with Staten to do the procurement and construction. Staten indicated that it could build a 1 MW plant for approximately 102.6 million Rupees (around $2.3 million USD at the time). Staten's proposal also included a 15 % bonus if the project was completed by September 15, 2011, the deadline for Econergy to secure the return of all five IREDA bank guarantees. Staten's bid attached a construction work-flow chart indicating that some five months (twenty-one weeks) were needed to complete the project. [#1785] Deol apparently did not respond to that bid.

A month later, Deol and Goel finally reached agreement on turning Econergy's Ludhiana project into a joint one by having GFV become an Econergy shareholder, director, and short-term lender. They entered into a "Co-Development and Investment Agreement" on June 7, 2011 ("Co-Development Agreement"). There were four parties to that agreement: Goel (individually), Goel Family Ventures I LP ("GFV"), Deol (individually), and Econergy. It called for a number of things, *inter alia*:

---

[11] The acreage was 10.194. [#1810]

[12] Deol and Goel had discussed whether Goel might contribute to Deol's land purchase costs, but ultimately nothing was agreed upon, as there was no Operating Agreement in place.

[13] The Indian tax year runs from April 1 of one year through March 31 of the following year, with tax returns due by September 30th. Thus, Econergy's first Indian tax return (for the fiscal year ending March 31, 2012) was not due until September 30, 2012.

**Exhibit A**                        PARTIAL FINAL AWARD (CORRECTED)

1. Equal Control of Econergy, Inc.: Deol and GFV immediately became co-equal directors of the corporation, with equal say over all corporate matters, and with the expectation that they would work together in a consensus fashion: "Mr. Deol and Goel Ventures agree that the investment in Econergy is conditioned on both parties agreeing to work with consensus on all matters including the operations, business, and investments pertaining to Econergy and to all matters concerning [Econergy's] land lease."

2. Corporate Shareholder Interests: Prior to this Agreement, Deol was Econergy's sole shareholder. The Agreement allowed GFV to acquire a 49% equity interest in Econergy, Inc., upon infusion of $212,745 of new capital. No time frame was stated for GFV to complete this equity contribution. GFV also received an equity credit of $87,500 for the money transferred to Deol the previous year for the bank guarantees. Upon payment of the additional $212,745, GFV's capital contribution would be at $300,245. Because Deol was credited with a "deemed equity" of $312,500, Deol and GFV would be 51% and 49% equity owners, respectively. The Agreement provided, however, that Deol's 51% interest would not give him any greater management or control rights.

3. Additional Capital Contributions: The Agreement also provided that, "if needed for the execution of the project," the equity owners would be required to put in additional equity totaling $600,000, of which Deol would contribute $306,000 and GFV would contribute $294,000, thus preserving their 51/49 equity ratio.

4. Long-term Borrowing for Construction Costs: Both Goel and Deol wanted to keep their combined equity contributions at no more than 20% to 30% of total project costs. As such, it was understood that even after a call for the additional $600,000 equity (which would put their combined post-Co-Development Agreement cash infusions at $812,745), the corporation would still need to raise an additional $1M to $2M by way of long-term commercial loans to complete the project. The Agreement called for Goel to seek that commercial funding.

5. Short Term Loans from GFV: The Agreement also provided that GFV would lend the corporation needed sort term money until the long-term funding was obtained: "Goel Ventures agrees to provide short term debt to Econergy at an annualized interest rate of 15% with the express understanding by all parties that Econergy will apply best efforts to replace the short term debt from Goel Ventures with commercial long term debt as soon as possible. Detailed terms of the short term debt will be specified when required."

6. Project Supervision During Construction: The Agreement also designated Goel as the party responsible for getting the plant built and approved: "Mr. Goel will be responsible for execution of the project per IREDA and PEDA requirements. Mr. Goel is hereby authorized to negotiate with vendors and contractors for completion of the project." This provision was included partly

**Exhibit A**

because of health issues that might prevent Deol from actively supervising the project, and because Goel, and his son Pooneet, would be in India frequently to help with Goel's various solar projects there. However, as Deol had family and connections in the Ludhiana area, the Agreement required him to recommend local resources to help on the project: "Mr. Deol will identify resources locally to support the project implementation at the site in India."

7. No Director or Employee Compensation Without Agreement: Neither of the two Directors, nor any employees or consultants, was to receive compensation for their work on behalf of this project unless agreed to in writing by both Directors.

8. GFV's Option to Purchase One-Half of Land: The Co-Development Agreement granted GFV an option to purchase one-half of Deol's land, for $300,000. This option could be exercised during the first six months after the plant was commissioned. If GFV exercised this option, Deol would transfer one-half of the land to GFV and thereafter GFV would receive one-half of the rent paid by Econergy under its lease.

9. Change in Land Use ("CLU") Approval: The land Deol had purchased was zoned agricultural. However, Deol represented to Goel, and the Co-Development Agreement so indiates, that a change in the land use designation (a "CLU") from agricultural to industrial, was not required for Econergy to build its solar farm there. "The Project can be implemented on the land without change of land use."

10. Bank Account(s) for Econergy: No particular bank account for Econergy was specified, although the Agreement provided that "[b]oth equity owners will have the right to require joint signature authority on all checks written from any Econergy bank account."

With the Co-Development Agreement in place, Econergy had barely three months to build its solar plant if it wanted to avoid loss of any of its bank guarantees. If the five month timeline in the recent Staten proposal was accurate, the initial IREDA deadline (September 16, 2011) was not feasible. Although Econergy had obtained project approval from IREDA nine months earlier, and had leased land, the project remained "green land" at the time of the Co-Development Agreement. Indeed, while under Deol's sole management, Econergy had neither selected an EPC contractor nor taken any concrete steps to build its plant.

Once on board at Econergy, Goel's first step was to find an EPC contractor, as the other steps in the process, from land improvements to ordering materials, depended on the plant's design. Goel quickly contacted a number of Indian-based EPC contractors, including Staten, Punj Lloyd and WIPRO; both Punj Lloyd and WIPRO inspected the site in mid-June. [#1612]

However, for various reasons, none of the Indian EPC contractors worked out. During that time, Goel also talked to Klaus Müller, the owner of TIF, the Spanish EPC

**Exhibit A**

company that Goel had used successfully on a solar project in Spain.[14] TIF was interested in bidding on the Econergy project and expressed confidence that it could complete the project by IREDA's final deadline (March 16, 2012).

On August 28, 2011, Econergy, Inc. and TIF entered into an EPC contract that called for TIF to design and construct the plant. The cost of TIF's design and construction work, which appeared as item 7 of the contract, was 10,996,800 Rupees (approximately $238,284 USD at that time). [#1003] Goel advised TIF that the project would be using 100 Watt PV panels manufactured by Green Energy Technology ("GET")[15], and to design the plant for those panels.

As a cost saving measure, Econergy was to procure most materials (the PV panels, the steel for the framework to hold the panels, and the electrical equipment such as inverters, strings, string combiners/diode boxes, etc.). TIF, however, was to procure certain of the cables and the riveted nuts (for attaching the panels to the steel frame). TIF had a trusted and preferred German supplier for these parts, and placed an order with that supplier.

Immediately after signing the TIF contract, Goel, on behalf of Econergy, entered into a contract with GET for the needed one thousand PV panels, and paid a deposit on that order. [#39]

Goel had also decided to use TIF, in varying degree, on his other solar projects in India. Thus, for example, two weeks after entering into the EPC contract for the Ludhiana project, Goel entered into an EPC contract with TIF on behalf of his Carlill project in Muktsar, Punjab. [#1788]

TIF's design work was completed quickly, and plans were made available on or about September 7, 2011. [#1565] Soon thereafter, on September 14, 2011, Pooneet Goel,[16] issued a progress report giving the status of the land preparation work ("civil work") as well as the status of the purchase orders for steel, panels, inverters, diode boxes/string combiners, etc. [#1621]

Not long after project got under way in September, the parties learned that Deol's earlier representation, that the project did not require a CLU, was incorrect; it became clear that the project needed a CLU if the plant was to be a legal land use. This also meant that the CLU was needed to order to obtain bank construction funding, as no bank would knowingly fund a nonconforming use. As such, Deol (as the sole landowner)

---

[14] Goel and Müller were co-owners of that plant.

[15] Deol's original proposal to PEDA had indicated that Signet Solar panels would be used. That apparently changed; after the Co-Development Agreement, Goel first looked at MASDAR panels, then both Goel and Deol decided on using Green Energy Technology panels.

[16] On-site supervision on behalf of Goel was to be done by his son Pooneet Goel, assisted by Surinder Singh, a relative of Deol's who lived in the area.

**Exhibit A**

applied for the CLU on October 2, 2011, and reported to Goel the next day: "We should be able to get the CLU this week. I am moving the administration at the highest level to get this done." [#301] Soon thereafter, Goel re-emphasized to Deol that obtaining the CLU was "critical" to the project and to Econergy's ability to obtain bank financing. [#1634]

At the time the Ludhiana project became a joint project in early June of 2011, there was little money in Econergy's coffers. Up to then, Deol's contributions had been his time and his payment of the costs of the PEDA and IREDA approvals. Although those payments became part of his "deemed equity," it was not money available to the corporation. Similarly, the bank guarantees were not monies available to Econergy at that point. Also, although the Co-Development Agreement called for GFV to become a 49% owner upon investing $212,745, the Agreement did not set a deadline for GFV to make that investment.

GFV, however, began putting money into Econergy as soon as the EPC contract was signed and the panels ordered. Between August 29th and October 7th, 2011, GFV put in $163,000. During that same time, Goel also arranged for two short-term loans to Econergy for an additional approximately $90,000: on September 21, 2011, Goel's Carlill project loaned Econergy 20 Lakhs (2 million Rupees) and on October 9, 2011, GFV loaned an additional 21 Lakhs (2.1 million Rupees). [#1662]

During that early stage, Deol may have contributed to Econergy's operating expenses. He claimed that following the making of the Co-Development Agreement, he had spent $31,000 on behalf of Econergy. Apparently, much of this was in the form of cash or checks given to his second cousin, Surinder Singh, to pay expenses at the plant site.

As for Econergy's long-term commercial funding, the Co-Development Agreement required Goel to seek that funding. Goel involved Econergy's Chartered Accountant, Vijay Goel (no relation) in the hunt for commercial funds. Deol also helped in the effort. [#1634] As part of their effort, in September Deol and Goel prepared a funding proposal for the Overseas Private Investment Corporation ("OPIC"). It described the status of the project as it existed in at that time, and predicted that, with funding, the plant could be built by the end of November [#1618].

The parties' effort to raise commercial money was not successful. Apparently, no lender wanted to lend, possibly because solar power production was new in India and it was unclear whether these plants would be profitable.

Because of the lack of success with bank funding, and knowing that even if the owners put in their remaining equity, they would not have enough money to complete the project, Goel became concerned. At that point, he communicated with Deol about options, including possibly cutting their losses by scrapping the project. By that time, too, GFV had become reluctant to put any more money into the project unless Deol did the same. As of that time, Deol may have contributed $31,000 for operating expenses,

**Exhibit A**

but GFV had put in over $250,000 ($163,000 of equity plus two short-term loans for an additional $90,000).

Also, it appeared that neither Goel nor Deol was eager to make the equity call for the additional $600,000 allowed by the Co-Development Agreement; they knew that, without major bank funding, their additional equity would not get the plant built, and possibly would be lost.

At that point, Goel offered to step in as the bank and loan Econergy the needed construction money from his personal funds. After heated negotiations, the parties reached agreement. Goel would loan Econergy up to $1.6M, provided both Deol and GFV promptly contributed the balance of the equity called for by the Co-Development Agreement. As such, Deol was to immediately put in $275,000 of his required $306,000 (and then either verify $31,000 of expenses he had already paid or make up the difference by the end of December), and GFV was to quickly put in the balance of its initial equity ($49,745) plus $294,000 for the second equity call, for a total due from GFV of $343,745.

Because Goel served as GFV's appointee to the Econergy Board of Directors, he abstained from voting on this loan. As such, Deol made the decision to enter into the Loan Agreement on behalf of Econergy. Also, in the Loan Agreement, Econergy and Deol waived any conflict of interest claim they might have against Goel. "Lender [Goel] and Guarantor [Deol] are also on the Board of Directors of Borrower [Econergy] and both Borrower and Guarantor acknowledge that they are executing this Agreement and waive any conflict of interest claims on the Lender related to this Agreement. Further, both Borrower and Guarantor agree that Lender has abstained from both (a) voting on any Board resolution to approve the terms of this Agreement and (b) voting to authorize Borrower to execute this Agreement."

In addition to the requiring that both Deol and GFV make their remaining equity contributions, the Loan Agreement had four main components:

1. The Loan Itself (essentially a construction draw account):

    a. The Loan Amount and Interest: Goel would personally loan Econergy up to $1.6M, when requested by Econergy and "made incrementally to service cash needs as they arise," with interest to accrue at 15% per annum on the monies advanced;

    b. Repayment of the Loan: There were no set periodic payment amount. Rather, Econergy needed only make payments from plant profits, i.e., the monthly revenue from PSPCL, minus operating expenses (which expenses were not to exceed 1M Rupees per year without consent). Econergy had four years to repay the loan starting on July 1, 2012. Also, until the loan was repaid, Econergy could defer its rent payments to Deol.

PARTIAL FINAL AWARD (CORRECTED)

**Exhibit A**

c. A "Lender Controlled" Econergy Bank Account: "[Econergy] agrees that [Goel] or [Goel's] nominee will be provided exclusive and complete control over [Econergy's] bank account in which all revenues derived by [Econergy's] Project will be subject to direct deposit from PSPCL and said control will remain until such time as the Loan is completely repaid along with any interest obligations." An AxisBank account in Econergy's name became that account.

2. Security for that Loan: As Econergy did not own the land, and had no assets at that time, Goel insisted on security for his loan. As such, Deol personal guaranteed 51% of Econergy's loan, backed by a pledge of Deol's shares in Econergy and an agreement to promptly give Goel a mortgage on Deol's land. The personal guarantee and the security could not be enforced by Goel unless Econergy was more than 90 days delinquent on the loan.

3. Obtaining the Project's CLU. As noted, well before the Loan Agreement the parties learned that a CLU was needed for the solar plant to be a lawful land use, and Deol had already applied for one. By the time of the Loan Agreement, the plant was due to become operational in just over ninety days, and thus the need for the CLU was even more urgent. Accordingly, the Loan Agreement required Deol to complete the process within 60 days, with Econergy to pay any expenses he incurred in doing so.

Also, given the urgency of obtaining the CLU before plant commissioning, and because of a concern that Doel's health issues might preclude him from attending to this matter, the Loan Agreement required Deol to immediately give Goel a power of attorney so that, if needed, Goel or his designee could act on Deol's behalf in obtaining the CLU.

4. GFV's Option to Purchase. The Loan Agreement reaffirmed GFV's option to purchase one-half of Deol's land within six months of plant commissioning. However, because the parties now knew that, by the time the option would be exercised, Econergy would be obligated to Goel on the construction loan, the Loan Agreement added a new provision: if GFV exercised its option and paid Doel $300,000 for the land, Deol would immediately put that money into Econergy as additional equity and GFV would then put in additional equity of $288,236 (thus preserving their 51:49 equity ratio), and this new equity (totaling $588,236) would be applied by Econergy to repayment of the outstanding loan.

With the infusion of the owners' additional equity ($618,745) and with an agreement now in place for funding the project when that equity ran out, the project moved ahead. However, very shortly Doel proposed a change in the supplier of the panels, from GET to NexPower, as a cost-saving move. Although Econergy had placed an order for GET panels months earlier and had paid a deposit, Deol wanted to explore this alternative supplier of panels. Goel quickly discussed this with TIF, to see if it was feasible at that late stage. TIF concluded that the change was possible, but would require

design changes, as the new panels produced more electricity (150 Watts compared to GET's 100 Watts), and thus one-third fewer were needed. This also meant that a number of features of the physical plant, including the structural steel, would need to be scaled back. Goel gave the go-ahead for the panel change and TIF quickly made the design changes. Goel then entered into a contract with NexPower for panels on December 15, 2011 [#40] and made a down payment of $120,876.00 on December 17, 2011. [#1542]

However, by the time of the panel change, the specially-manufactured riveted nuts that TIF had ordered for use with the GET panels had been delivered by the manufacturer to an airport in Germany, ready for airfreighting to India. With the change in panels, these items became useless for the Ludhiana plant and apparently had no resale value either. Although they had been paid for, Goel made the decision to simply leave them at the airport in Germany, to save the cost of airfreight and eliminate the need for Econergy to store useless parts at its Ludhiana plant.

Fortunately, Goel was able to cancel the original GET panel contract without loss of the deposit. Also, because the new design did not require all of the steel and cables that had been ordered, Goel arranged for his other projects to buy some of the excess from Econergy.

After the redesign by TIF, the project again moved forward. At that point, the project had just three months remaining if it wanted to keep its favorable tariff with PSPCL and not lose all of its bank guarantees. Those final three months at the site were quite busy. Pooneet Goel was frequently on-site, as were the two electrical engineers provided by Goel (Niraj Mehta and Rajeev Ranjan). Deol, who was unable to be present, had his second cousin Surinder Singh ("Surinder") helping on the project. Also, Surinder has hired two local farmers to serve as security guards. TIF, as the EPC contractor, was the construction supervisor, and several people from TIF, including Klaus Müller, worked at the site at various times.

As previously noted, Goel was involved in developing three other solar plants under the PRSSGP program, all on the same timetable as Ludhiana. Goel's engineers (Mehta and Ranjan) worked on his other projects, as did TIF's personnel. Also, some of TIF's equipment, such as the ramming machine, rotated between these projects. For example, when the ramming machine first arrived in India it was taken to the Econergy site; however, the steel had not yet been delivered, so the machine was moved to a site that was ready for ramming.[17]

The Ludhiana plant was completed in early March 2012. Following inspection by PEDA and IREDA officials, it was synchronized to the grid and officially commissioned on or about March 2, 2012. [#25] As such, Econergy met IREDA's March 16, 2012 deadline, and was able to secure the return of the final two bank guarantees as well as enjoy the favorable tariff (17.91 Rupees per kwh) for selling electricity to PSPCL.

---

[17] TIF provided the ramming machine at no additional cost, but required that each project pay for any parts and supplies, such as hammerheads and fuel, used at that site.

**Exhibit A**

At a celebratory dinner following commissioning, Klaus Müller, who was concerned over Econergy's plans for on-site maintenance of the plant, offered Deol a contract under which TIF would provide operation and maintenance services. Deol declined, saying that he has it "under control."

For the first three months following commissioning, all went well other than some minor glitches with the new equipment, which were remedied. Then, however, beginning in mid-2012, tensions between Goel and Deol begin to develop over a number of issues:

1.  GFV's Exercise of its Purchase Option:

In June of 2012, Goel, who was satisfied with the project, gave written notice that GFV was exercising its option to buy one-half of the land under the farm; Deol acknowledged that exercise. However, that sale could not take place as long as the land remained zoned as agricultural; the CLU was needed. The CLU had been required of Deol by the Loan Agreement and he was to have been obtained it by late January 2012. Yet, as of June 2012, Deol had not done so, and had not given Goel a power of attorney for the CLU.

After exercising the option, Goel frequently inquired of Deol as to the status of the CLU; Deol had myriad reasons why he had not yet obtained it. At one point, he said that it was a "done deal"; then later said a municipal labor strike was delaying matters, then said that Surinder was too busy to deal with it, or that certain fees were due, for which he was seeking a waiver. In December 2012, a full six months after exercising its option, GFV was still attempting to have Deol produce the CLU and complete the sale.

Then, at a point, Deol told Goel that he no longer was willing to sell, as the land has sentimental value, and besides, he was not happy with the agreed-upon price. Also, in April of 2013, Deol told Goel that he considered the sale to be "moot" because Deol had concerns over Goel's accounting of construction costs. [#1702][18]

2.  Concerns Over Plant Performance:

At a point in mid-to-late 2012, the parties began having concerns over the plant's output, which was less than TIF initially had predicted.[19] The two directors discussed possible causes and involved Klaus Müller, and others, in their discussions. Also, at a

---

[18] Deol testified that about a year after this arbitration commenced, and several years after GFV's exercise of its purchase option, he obtained a CLU on November 10, 2014. He produced a document purporting to be the CLU, but it had various conditions, including one that precluded a sale of one-half of the land to GFV (by prohibiting a division of the land). [#1810].

[19] TIF had estimated output by using the "PVsyst "computer simulation program.

point in 2012 it was discovered that some of the panels were exhibiting TCO corrosion,[20] which would reduce a panel's output.

The directors knew there were at least five factors that could be affecting the plant's output: (1) poor operation and maintenance (e.g., dirty panels, blown fuses, oxidized parts, etc.); (2) inadequate plant design; (3) poor construction (such as improper grounding that might lead to TCO corrosion); (4) defective panels from the manufacturer; and (5) local grid downtime (which prevented the plant from feeding power into the local grid).

Goel and Deol had differences of opinion as to the main causes of the reduced output. Goel felt, as did Klaus Müller after his inspections in 2012, there were two causes: (1) severe maintenance deficiencies and (2) defective NexPower panels that allowed moisture to invade the layers of the panels, causing TCO corrosion. Deol, on the other hand, felt the main cause of the reduced output was TCO corrosion, which he believed was caused solely by inadequate grounding of the panel frames by TIF.

The two directors argued over these matters and over whether Econergy should pursue remedies against either TIF or NexPower. Because Goel was of the opinion that TIF's work was not the cause of the TCO corrosion, he did not recommend pursuing TIF. He also concluded that it would be economically unwise for Econergy to pursue NexPower in arbitration in Taiwan for allegedly defective panels. Deol, on the other hand, felt that the main problem was TCO corrosion and that this had been caused solely by inadequate grounding by TIF, and that this inadequate grounding had caused NexPower to deny Econergy's warranty claim on the defective panels. In early 2013, Goel agreed with Deol's recommendation to add additional grounding between the panels [#1700], but this work apparently was not done until sometime in 2014, after Deol had received the GenSol report, discussed below.[21]

At a point, Deol accused Goel of having a conflict of interest with regard to TIF (because of Goel's various dealings with TIF). Goel then recused himself and left to Deol the decision on whether Econergy should pursue TIF for construction or design defects. To date, Econergy has pursued neither TIF or NexPower. Interestingly, improvements in plant maintenance were implemented after Müller's observations of the plant's conditions in 2012, and plant performance increased significantly in 2013,[22] and has remained fairly constant.

---

[20]Transparent Conducting Oxides ("TCO") form one of the layers in the PV panels. If that layer corrodes or delaminates, it can reduce the electrical output of the panel.

[21] Deol, sometime after receiving the GenSol report in December of 2013, installed additional grounding between the tables. This modification did not increase plant productivity, but Deol testified that these changes increased plant stability and reduced shocks to workers at the plant. Interestingly, after claiming that these modifications were needed because of TIF's inadequate work, Deol did not pursue TIF for the costs of that remedial work.

[22] In 2012, the plant was producing 25% below expectations; in 2013, at 13% below expectations.

**Exhibit A**

At a point in 2013, and unbeknownst to Goel, Deol hired a third party, Gensol Consultants Pvt. Ltd. ("GenSol"), to inspect the plant and render a report on production issues. GenSol issued a report in December of 2013 [#1301], but it went to Deol only;[23] Goel was unaware of this report until well into this arbitration. And, importantly, the report was not something that either of the directors had available to them when they held their discussions in 2012 and 2013.

### 3.   Goel's Concern over Deol's Delayed Return of the Bank Guarantees:

The plant was completed and commissioned before the final IREDA deadline, and thus two of the 1M Rupee bank guarantees were returned by IREDA on June 11, 2012. [#25] These were sent to Deol, who placed the money into his personal bank account. Goel requested that Deol move these funds into Econergy's account, as they were part of either Goel's or Deol's equity contributions. Deol eventually did return the funds to Econergy, but did not include any interest he had received on the funds, either while they were being held by IREDA or after their return.

### 4.   "Plant Accounting":

Beginning in mid-2012, Deol began voicing concerns over the quality of Goel's record keeping from the construction phase, which included the advances Goel made to Econergy under the Loan Agreement and the expenditure of those funds.

Deol asked for the records, and Goel furnished various records and the underlying documentation. Deol acknowledged that he was not an expert on accounting, but complained that what he had been given was incomplete or contradictory. In early 2013, Deol paid two visits to C.A. Vijay Goel, Econergy's accountant in Delhi, and received additional records from him. Deol, however, remained dissatisfied with the information he had received.

### 5.   Deol's Accusations of Improprieties:

During that same time, Deol also began making accusations of wrongdoing by Goel, i.e., that he diverted some of Econergy's construction materials to Goels' other projects without proper compensation, improperly allocated Niraj Mehta's and Rajeev Ranjan's time between the different projects, and misallocated certain of TIF's costs between the different projects.

/ / / / / / /

---

[23] Deol, sometime after receiving the GenSol report in December of 2013, made some changes to the panel frame grounding. This modification did not increase plant productivity, but Deol testified that these changes increased plant stability and reduced shocks to workers at the plant. Interestingly, after claiming that these modifications were needed because of TIF's inadequate work, Deol did not have Econergy pursue TIF for the costs of that remedial work.

**Exhibit A**

6.  Goel's Concerns Over Econergy's Failure to Grant GFV Formal Recognition
of its Ownership Interest in Econergy:

The Co-Development Agreement provided that, upon making its initial equity
contribution of $212,745, GFV would become a 49% shareholder of Econergy, and that
Econergy would provided the necessary documentation (Stock Purchase Agreement,
Share Certificate, etc.).  GFV completed its $212,745 equity contribution in late 2011,
yet the documentation of its ownership was not forthcoming.  In early 2013, Deol and
Goel communicated with Econergy's attorney at Gordon & Rees in Sacramento
regarding these matters, but a dispute quickly developed when Deol told the attorney that
Goel's construction loan was not to be repaid, but rather converted to equity.  As the
corporate attorney wrote: "Per Jaspal, the loan is converted to equity, and is therefore not
to be repaid."  Goel promptly responded: "I am not sure how there is any disagreement
on treatment of the loan – loan and equity are clearly separated."  [#1034]

As tensions between the parties increased in early 2013, they used the services of
Harsuhinder Brar, the owner of the Carlill plant in Muktsar, as an informal mediator:
unfortunately, their issues remained unresolved.

Then, starting in mid-2013, Deol took a series of actions clearly aimed at
wrestling control of Econergy, excluding GFV, and causing Econergy to disavow its
obligations on Goel's construction loan. These actions included:

(1) Deol summarily fired Econergy's accountant, Vijay Goel, C.A., in May of
2013, and took the corporation's accounting work to his own accountant,
Neelkant Gargya of Sanjay Arora, C.A.  However, in doing so, he did not tell
Gargya about GFV being a co-director and a 49% co-owner of the corporation, or
of Goel's loan of nearly $1M to Econergy.   Rather, Deol told Gargya that he was
the sole shareholder. As such, Gargya filed an Indian 2012 tax return (for the
fiscal year ending March 31, 2012) that made no mention of Goel or GFV.
Gargya testified in his deposition that Deol never told him of the existence of
Goel or GFV or the loan;[24]

(2) Deol stopped depositing the monthly PSPCL revenue into Econergy's
"lender's account" at Axis Bank, and instead opened another bank account in
India (at HDFC bank) where he deposited this money;

(3) Deol instructed his U.S. accountant for Econergy, Karilyn Edwards, to file a
U.S. tax return for Econergy for 2012 that stated that Deol was the 100%
shareholder.  Ms. Edwards also filed a 2013 return for Econergy, in which Deol

---

[24] After the firing of Vijay Goel as Econergy's accountant, the parties reached an agreement on the use of
separate C.A.s in India, with separate payment to be made personally by each:  Goel was to use and pay for
Vijay Goel; Deol was to use, and pay for, Sanjay Aurora & Assocs.  Goel now alleges that Deol failed to
honor that agreement and instead used Econergy's money, rather than his own, to pay for Sanjay Aurora &
Associates.

**Exhibit A**            PARTIAL FINAL AWARD (CORRECTED)

is again shown as the sole shareholder. Deol disavows having a role in this second filing, claiming that it was done by Ms. Edwards without his knowledge or input, and likely done by her simply as a "placeholder" for the corporation's tax filings. However, he did not deny instructing her to list him as the 100% shareholder in the 2012 return.

(4) Deol transferred Econergy money to another of his solar projects in India (Allianz EcoPower). He later returned this money to Econergy, saying the initial transfer was simply a "mistake."

(5) In March, 2013, Deol told GFV that the sale of one-half of the land pursuant to the exercise of the option was "moot" because of Deol's concerns over "plant accounting" matters;

(6) Deol later transferred money from Econergy's Indian accounts to his own Indian bank account or to U.S. accounts under his sole control;

(7) Deol told others that GFV and Goel held no ownership interest in Econergy;

(8) Deol did not complete the share transfer documentation to verify GFV's 49% ownership interest in Econergy.

Following Deol's actions, particularly the ending of revenue deposits into the lender's account at Axis Bank, Goel filed for Arbitration on Dec. 3, 2013, claiming breaches of both the Co-Development Agreement and the Loan Agreement. Subsequently, Goel became aware of other actions taken by Deol to the alleged detriment of GFV's holdings in the corporation, such as by Deol's use of corporate funds for non-Econergy matters. As such, Goel amended his arbitration demands in early 2015 to add claims on behalf of GFV. The amended claims were for further breaches of the Co-Development Agreement and of the Loan Agreement (by both Deol and Econergy), as well as for breaches of fiduciary duties by Deol.

At the end of 2014, Deol and Econergy counter-claimed in this arbitration, with allegations of breach of fiduciary duty (by Goel); breaches of contract (by both Goel and GFV); conversion of corporate property (by Goel); a common count for money had and received (by Goel), and requesting an accounting. An additional breach of contract claim (based on alleged breaches of the contracts' implied covenant of good faith and fair dealing), as well as a claim for usury, were later added by Deol.

The current claims are outlined in Section III (immediately below) and the requested relief is described in Section IV. The claims are analyzed, and ruled upon, in Section V.

/ / / / / / /

/ / / / / / /

PARTIAL FINAL AWARD (CORRECTED)

**Exhibit A**

### III. SUMMARY OF CLAIMS

The parties have traded a large number of accusations, with Goel and Deol each making numerous individual claims against the other as well as against one or both of the entities. Also, each entity is making various claims. However, putting aside for the moment whether a particular claim is being advanced by, or leveled against, an individual or an entity (or both), the claims may be divided into two main groups, as follows:

A. Goel and GFV's Claims:

1. Econergy has not repaid any portion of the construction funds loaned by Goel in 2011, despite having received five years of revenue from PSPCL. As the loan's maturity date has now passed, the full loan amount of $997,716, plus interest, is owing from Econergy to Goel;

2. Following Econergy's default on the loan, Deol likewise has not performed his obligations under the Loan Agreement, i.e., he has not made good on his personal guarantee and has not delivered the pledged security (his shares and his land);

3. Deol also breached the Loan Agreement by not obtaining the CLU in a timely manner. By not obtaining the CLU, Deol has prevented Econergy from obtaining a bank loan that could have paid off Goel's loan to Econergy, and also prevented GFV's purchase of one-half of the land;

4. By not honoring GFV's exercise of its purchase option, Deol has not only prevented GFV from acquiring one-half of the land but has also prevented Econergy from receiving additional equity of $588,236, which was to have have been used by Econergy to pay down a large portion of Goel's loan;

5. Deol has breached many of the fiduciary duties he owed to Goel, to GFV, and to Econergy by causing Econergy to default on Goel's loan, by excluding GFV from the corporation and denying GFV's ownership interest therein, by failing to maintain proper corporate records, by misleading accountants, by causing Econergy to file false tax returns, and by looting corporate funds for non-Econergy matters.

6. Deol has not properly accounted for the $31,000 he claimed to have expended on behalf of Econergy in the five months between the Co-Development Agreement and the Loan Agreement; and

7. Deol has not turned over to Econergy the interest he received on the IREDA bank guarantees.

///////

PARTIAL FINAL AWARD (CORRECTED)

**Exhibit A**

B. Deol's and Econergy's Claims:

1. Goel and/or GFV have breached the Co-Development Agreement and the Loan Agreement, as well as Goel's fiduciary duties, by the following:

   a. By failing to timely complete the plant, and thus causing Econergy to forfeit three of its IREDA Bank guarantees and lose several months of revenue from PSPCL;

   b. By failing to execute the project "per IREDA and PEDA requirements";

   c. By failing to require TIF and other contractors to fully and properly perform their contractual obligations;

   d. By failing to properly account for construction costs;

   e. By failing to properly account for the loans Goel made to Econergy under the Loan Agreement;

   f. By diverting Econergy's construction materials to Goel's other solar projects;

   g. By failing to properly apportion, between Goel's various projects, the expenses of shared personnel (such as Niraj Mehta and Rajeev Ranjan) and by failing to properly apportion certain construction costs (such as for parts and fuel for the ramming machine);

   h. By failing to work in a consensus fashion with Deol.

2. The Loan Agreement is unenforceable, either because it was procured by duress or because its terms are unconscionable;

3. Even if the Loan Agreement is not voided, its 15% interest provision is usurious and thus no interest should be allowed and treble damages should be awarded on whatever interest Econergy has paid to date;

4. Even if the Loan Agreement is enforceable, Ecoergy has repaid this loan in full, or is excused from doing so;

5. That Goel and GFV have breached the Loan Agreement; and

6. That Goel has not performed his obligations following GFV's exercise of its option to purchase one-half of the land, including not performing his obligation to obtain a power of attorney from Deol and not procuring the CLU himself.

**Exhibit A**

## IV. RELIEF REQUESTED

The parties have requested extensive and detailed relief, as follows:

A. The Relief Requested By Goel and GFV:

1. That Econergy be found in breach of the Loan Agreement and held liable for the principal loan balance of $997,716 plus interest at the legal rate of 10%, and that Deol be held liable for 51% of that amount as the guarantor of that loan;

2. That Deol be determined liable to Econergy for all interest received on the IREDA bank guarantees;

3. That Deol be ordered to return all Econergy funds misappropriated to date, with interest;

4. That Deol be ordered to return the principal and interest on unauthorized payments made by Econergy to Surinder Singh, Sanjay Arora & Associates and Amrita Kaur;

5. That Deol provide indemnification for all U.S., California, and Indian tax liabilities of Econergy, Inc., including indemnification for amounts assessed as penalties, charges, costs or fees caused by the improper filing of tax returns or failure to timely file tax returns;

6. That Deol be removed as a Managing Partner of Econergy;

7. That Deol be ordered to pay the unpaid expenses previously allocated to Econergy for Niraj Mehta's and Rajeev Ranjan's work;

8. That Deol be removed as a Director of Econergy;

9. That Deol's shares in Econergy be forfeited;

10. That the land on which the Econergy plant is situated be transferred to Claimants or their authorized designees;

11. That all of Deol's shares in Econergy be disposed of in favor of Goel;

12. That Deol be removed as an authorized signatory on all Econergy bank accounts;

/ / / / / / /

/ / / / / / /

PARTIAL FINAL AWARD (CORRECTED)

**Exhibit A**

13. That Deol be removed as an authorized representative of Econergy, Inc. for all purposes, including interaction with IREDA, PEDA, PSPCL, the Registrar of Companies in India and all U.S., California and India tax authorities;

14. That Deol be ordered to provide a full accounting of monies taken by Deol from Econergy's bank accounts and ordered to return said monies plus interest;

15. That a constructive trust be imposed on Deol's interest in Allianz EcoPower and Allianz Group LLC and any other business or project where Deol's contributions or payments were made with Econergy funds;

16. That an Order issue requiring Deol to turn over to Claimants all original Econergy related documents (or copies if originals are unavailable) in his possession or in the possession of Sanjay Arora or any other third parties that he has engaged;

17. That an Order issue directing Deol to provide Goel with a complete and itemized list of all filings made on behalf of Econergy with any regulatory authority – in India and in the United States.

B.  The Relief Requested By Deol and Econergy:

1. That GFV be deemed in breach of the Co-Development Agreement and ordered to pay damages to Econergy;

2. That the delay penalties incurred by Econergy in the amount of $66,667 (i.e., the three forfeited IREDA bank guarantees) plus interest be deemed a credit against Econergy's debt to Goel under the Loan Agreement;

3. That damages for historical loss of plant production (due to reduced plant output) in the amount of $681,074, plus interest from June 10, 2016, be awarded to Econergy;

4. That damages for future loss of plant production in the amount of $824,843 plus interest from June 10, 2016, be awarded to Econergy;

5. That damages for the abandoned riveted bolts in the amount of $20,346, plus interest from June 10, 2016, be awarded to Econergy;

6. That GFV be deemed to have exercised its option to purchase one-half of Deol's land and ordered to deposit $588,236 into the Econergy accounts, to be credited against the loan balance;

7. That the Loan Agreement be ordered voided as the product of duress, or, if not voided, that some or all of its terms be declared unconscionable and thus unenforceable;

8. That the Loan Agreement be deemed usurious and no interest permitted;

9. That the sum of $378,731.04 ($307,000 for the money in the Axis Bank account and $71,731.04 for the money placed in the Morgan Stanley account in early 2013) be applied as a credit to Goel's Loan, and deemed interest paid by Econergy under the Loan Agreement;

10. That three times the above amount (i.e., $1,136,193.12) be awarded to Econergy as treble damages for having made usurious interest payments to Goel;

11. That Econergy and Deol be deemed not in default under the Loan Agreement;

12. That the loan be deemed paid in full;

13. That the amount of 1,865,220 Rupees per year from March 2, 2012, be deemed owed by Econergy to Deol as rent due under the lease; and

14. That GFV and Goel be ordered to provide a consolidated detailed accounting of all loan funds expended, and construction costs incurred, and that all income received in the AXIS bank account be credited to the Loan balance.

## V. DISCUSSION / CONCLUSIONS

There are some nineteen issues requiring rulings before remedies are considered. Those rulings are made in this section; remedies will be discussed in Section VI.

### 1. Did Goel commit any breaches of fiduciary duty *prior to* entering into the Co-Development Agreement?

Deol argues that a partnership, with resulting fiduciary duties, was formed well before the Co-Development Agreement, and that Goel breached his partnership duties during that time. Deol bases this argument on the parties' early discussions regarding the Ludhiana project and the April 2010 agreement between the Goel Family Group LLC and Econergy (Agreement for Solar Farm Projects in India). According to Deol, "[t]hat agreement established a legal partnership relation between the parties, and imposed fiduciary duties of loyalty and condor from that point forward." [Deol/ Econergy's Opening Brief @ 5: 7-9.]

Deol, however, misconstrues the parties relationship as it existed prior to the June 2011 Co-Development Agreement. We know that, in early 2010, the parties discussed

**Exhibit A**                    PARTIAL FINAL AWARD (CORRECTED)

how Econergy might undertake joint projects with one of Goel's investment entities, and that Econergy's project at Ludhiana was one possible joint project. However, the April 2010 Agreement for Solar Farm Projects in India was a very non-specific statement of intent that two entities would, in the future, bid together "as a consortium" on solar projects. That Agreement also required the two entities to enter into an Operating Agreement by the end of April to be effective. No such operating agreement was forthcoming, and no consortium bid was ever submitted by the parties. And, the Operating Agreement that was made some eighteen months later was with a different Goel entity.

Additionally, following the April Agreement, Deol undertook actions on behalf of Econergy that belied the existence of an Econergy-Goel Family Group partnership for the Ludhiana project. For example, Econergy's PEDA and IREDA applications, as well as its Power Purchase Agreement with PSPCL, were solely in the name of Econergy; there was no mention of a partnership with the Goel Family Group LLC or any other entity.

Months later, in January of 2011, well after Econergy had obtained IREDA approval for its Ludhiana project, Goel proposed an Operating Agreement that would have made the Ludhiana project a joint one, but Deol was not ready. And, as late as March of 2011, Deol again expressed reluctance to make the Ludhiana project a joint one with a Goel entity.

Despite these facts, Deol now argues that Goel breached his fiduciary duties *prior to the June 2011 Co-Development Agreement* in that he (1) delayed construction of the Ludhiana plant, i.e., "Dr. Goel offered no reasonable explanation for the delay [in plant construction] from [IREDA's] award of the project until the Project Development Agreement was signed" [Opening Brief @7:25-26], and that Goel (2) failed to help Deol with the purchase of real property for the Ludhiana plant, i.e., ". . . [Goel] refused to fund one-half of the cost of procuring the site for the Project." [Opening Brief @ 24:23-24]

These arguments conveniently ignore the fact that Goel did have a very reasonable explanation for his actions during that time: no agreement existed for any Goel entity to be involved in Econergy's Ludhiana project. After IREDA's September 2010 approval, and before the Co-Development Agreement, Deol remained the sole shareholder and director of Econergy. As noted, all PEDA and IREDA applications and approvals, as well as the Power Purchase Agreement, were solely in the name of Econergy. Even if a Goel entity had wanted to, it could *not* have acted on behalf of Econergy during that time, such as by hiring an EPC contractor or ordering materials on behalf of Econergy.

Similarly, Goel did not "refuse" to fund one-half of the land purchase costs. At best, the parties had conducted very preliminary discussions regarding whether Geol would participate in a land purchase, but they never reached agreement. The fact that, in early 2011, Goel declined Deol's informal email request for money for a land purchase cannot be considered an unreasonable "refusal" to fund; the parties had no agreement in place for co-purchasing land.

**Exhibit A**

If Econergy and the Goel Family Group LLC truly were partners and owed fiduciary duties to each other as the result of the April 2010 agreement, then Econergy was equally in breach of its partnership obligations. Econergy made no mention whatever of this partner in its Detailed Project Report to PEDA, or in its IREDA application, or in the Power Purchase Agreement. And, after IREDA's project approval, Econergy took no action to construct the plant for nearly nine months. At that time, there was no agreement calling for one of these supposed "partners" to take the lead on plant construction, and Econergy was equally capable of moving the Ludhiana project forward during that time. In Econergy's June 2010 project submittal to PEDA, Deol described Econergy's vast experience building solar energy projects worldwide. Yet, for some nine months following IREDA's approval, and despite Goel's suggestions as to available design and construction resources, Econergy did not select an EPC contractor, order materials, or start construction.

In sum, it cannot be said that Goel, or any of his investment entities, breached any fiduciary duty owed to Deol or Econergy at any time before the making of the Co-Development Agreement; no such duty existed during that time.

### 2. Is the Loan Agreement voidable by Econergy or Deol due to duress in the making?

Deol and Econergy argue that the Loan Agreement is voidable at their option because their consent was obtained through duress, economic and personal.[25] A contract obtained under duress, although not automatically void, may be voided by the aggrieved party: ". . . although a voidable contract may be disaffirmed, or rendered null, at the option of the wronged party, such contracts are not void until so rendered. Typical examples of voidable contracts include those . . . where the consent was induced by fraud, mistake or duress." Cal. Civ. Prac. Business Litigation § 24:7 (2016) [internal citations omitted.] Although Deol and Econergy do not use of the word "rescission" in their request to void the Loan Agreement, clearly it is the remedy they seek. The process by which a voidable contract is declared void is by seeking an order for its rescission under C.C. § 1689(b)(1), which permits voiding a contract when " . . . the consent of the party rescinding . . . was . . . obtained through duress, menace, fraud, or undue influence."

Without determining whether Goel's negotiations for the Loan Agreement amounted to legally-cognizable duress,[26] it is clear that neither Econergy nor Deol is in a position today to request avoidance of the Loan Agreement on grounds of duress. First, after the alleged duress, they accepted the full benefit of that contract, i.e., received nearly one million dollars of Goel's money to build the solar farm. The law is clear that, if after entering into a contract under alleged duress, the wronged party thereafter accepts the benefits of the contract, that party will be deemed to have ratified the contract. See,

---

[25] Deol is not arguing that a loan between a director and a corporation is *ipso facto* void.

[26] There does not appear to have been unreasonable duress on Goel's part; the duress that existed in November of 2011 was not of Goel's doing; it was the result of the fact that commercial funding was not available for this project, despite the parties' best efforts, placing the entire project in jeopardy.

PARTIAL FINAL AWARD (CORRECTED)

**Exhibit A**

e.g., *Smith v. Glo-Fire Co.* (1949) 94 Cal.App.2d 154. Secondly, if a contract is to be rescinded, the parties must be restored to their *status quo ante*: ". . . rescission is a remedy that *disaffirms* the contract. The remedy of rescission necessarily involves a repudiation of the contract. Rescission extinguishes the contract (Civ. Code, § 1688), terminates further liability, and restores the parties to their former positions by *requiring them to return whatever consideration they have received*." *Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1144-1145 [first italic in original, second added; internal quotes and citations omitted]. Neither Econergy nor Deol has offered, as part of their request to void the Loan Agreement, to restore to Goel the monies Econergy received from him under that Agreement.

### 3. Even if the Loan Agreement is not voidable due to duress, are some or all of its terms unenforceable due to unconscionability?

Deol and Econergy also argue that, even if the Loan Agreement is not voided, some or all of its provisions are unconscionable and should not be enforced.

A. General Rules Retarding Unconscionability:

The general rules governing the determination of whether contract terms are unconscionable are fairly straightforward: "The core concern of the unconscionability doctrine is the absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1145 (citation and internal quotation marks omitted). However, "[t]he unconscionability doctrine is concerned not with a simple old-fashioned bad bargain." *Sonic-Calabasas*, 57 Cal.4th 1109, 1145 (citation and internal quotation marks omitted).

"Unconscionability has a procedural and a substantive element; the procedural element focuses on the existence of oppression or surprise and the substantive element focuses on overly harsh or one-sided results." *Gatton v. T-Mobile USA, Inc.* (2007) 152 Cal.App.4th 571, 579. "To be unenforceable, a contract must be both procedurally and substantively unconscionable, but the elements need not be present in the same degree." *Id.* "The more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.* (citation omitted).

"The procedural element requires oppression or surprise." *Lhotka v. Geographic Expeditions, Inc.* (2010) 181 Cal.App.4th 816, 821. "Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form." *Lhotka*, 181 Cal.App.4th at 821 *Id.* "When a contract is oppressive, awareness of its terms does not preclude a finding of procedural unconscionability." *Abramson v. Juniper Networks, Inc.* (2004) 115 Cal.App.4th 638, 663. "The procedural element of an unconscionable contract generally takes the form of a contract of adhesion, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the

opportunity to adhere to the contract or reject it." *Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1071 (internal quotation marks omitted). "To put it another way, procedural unconscionability focuses on the oppressiveness of the stronger party's conduct." *Abramson*, 115 Cal.App.4th at 662. (citation omitted). Evidence that contractual provision "is part of a nonstandard contract freely negotiated by parties of comparable bargaining power, 'such as may exist between an employer and a highly compensated executive employee,' weighs against a finding of unconscionability." *Sonic-Calabasas*, 57 Cal.4th at 1148. "Where an adhesive contract is oppressive, surprise need not be shown." *Nyulassy v. Lockheed Martin Corp.*, 120 Cal.App.4th 1267, 1281 (citation omitted).

"Substantive unconscionability addresses the fairness of the term in dispute." *Szetela v. Discover Bank* (2002) 97 Cal.App.4th 1094, 1099. "The unconscionability doctrine ensures that contracts, particularly contracts of adhesion, do not impose terms that have been variously described as 'overly harsh,' 'unduly oppressive,' 'so one-sided as to shock the conscience' or 'unfairly one-sided.'" *Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 910–11 (citations and some quotation marks omitted). "All of these formulations point to the central idea that unconscionability doctrine is concerned not with 'a simple old-fashioned bad bargain' but with terms that are 'unreasonably favorable to the more powerful party.'" *Id.* at 911. These include "provisions that seek to negate the reasonable expectations of the nondrafting party, or unreasonably and unexpectedly harsh terms having to do with price or other central aspects of the transaction." *Id.* (citation omitted). The Supreme Court further stated in Sanchez, at 911:

> . . . an examination of the case law does not indicate that 'shock the conscience' is a different standard in practice than other formulations or that it is the one true, authoritative standard for substantive unconscionability, exclusive of all others." [citation omitted.] Nor do we see any conceptual difference among these formulations. Rather, "courts, including ours, have used various nonexclusive formulations to capture the notion that unconscionability requires a substantial degree of unfairness *beyond 'a simple old-fashioned bad bargain.'*" [citation omitted.] This latter qualification is important. Commerce depends on the enforceability, in most instances, of a duly executed written contract. A party cannot avoid a contractual obligation merely by complaining that the deal, in retrospect, was unfair or a bad bargain. Not all one-sided contract provisions are unconscionable; hence the various intensifiers in our formulations: "*overly* harsh," "*unduly* oppressive," "*unreasonably* favorable." [citation omitted]

Assuming, solely for discussion purposes, that procedural unconscionability was present here, the question remains whether the terms of the Agreement are substantively unconscionable as relates to either Econergy or Deol.

**Exhibit A**

The burden, of course, is on Econergy and Deol to demonstrate the claimed unconscionability. "Because unconscionability is a contract defense, the party asserting the defense bears the burden of proof." *Sanchez v. Valencia Holding Company, LLC.* 61 Cal.4th 899, 911. Further, "[t]he critical juncture for determining whether a contract is unconscionable is the moment when it is entered into by both parties -- not whether it is unconscionable in light of subsequent events." *American Software, Inc. v. Ali,* 46 Cal.App.4th 1386, 1391. Finally, the setting in which the agreement was made is important: "[a]n evaluation of unconscionability is highly dependent on context." *Sanchez, supra,* 61 Cal.4th at 911.

### B. Is the Loan Agreement Unconscionable as to Econergy?

The Loan Agreement basically called for Goel to be ready to provide construction funding of up to $1.6 million "incrementally to service cash needs as they arise," with Econergy to repay the advanced funds over four years, but only out of profits remaining after payment of operating expenses; there were no required minimum payments; only a final payment of any balance at the end of four years.

There was no showing that these terms were more favorable to Goel than a commercial loan would have been: "Directors may advance money to or for the corporation by way of loan when they deem such transaction to be in the interest of the corporation and may take its note for the amount, the terms being as favorable as any on which the corporation could have procured the money elsewhere." 15 Cal.Jur.3d Corporations at § 280 [internal citations omitted].

Also, this loan easily could have easily repaid by Econergy if Deol had honored GFV's exercise of its option to purchase one-half of the land (which would have reduced the loan balance by $588,236), and if Deol had applied each year's PSPCL profit to the loan, as required.

Other than the usurious 15% interest rate, which is not *per se* unconscionable, there is nothing about this loan that can be said to shock the conscience; as such, it is a not unconscionable as to Econergy.

### C. Is the Loan Agreement Unconscionable as to Deol?

Not surprisingly, Goel wanted security for his loan to Econergy (a corporation with no assets), and Deol agreed to guarantee the loan (up to 51%) and to provide security for that guarantee -- he pledged his shares in the corporation as well as his real property under the plant.

In the Loan Agreement, Deol also agreed to obtain a CLU for his land, and to defer receipt of rent from Econergy until the loan was repaid.

Again, there is nothing in these terms that shocks the conscience. Goel's request for a personal guarantee for his loan was not unreasonable given size of the loan and the

**Exhibit A**

borrower's lack of assets. The personal guarantee and the security pledged by Deol were not shown to be unreasonable for the size and type of loan, and, again, there was no evidence that a commercial lender would not have required similar protections.

Further, the requirement that Deol obtain a CLU was not unreasonable or unconscionable; it was already known that Econergy needed a CLU for the plant to be a lawful land use, and Deol had applied for it two months earlier. And, the deferral of rent payments from Econergy to Deol until the loan was repaid does not appear unreasonable; the rent was simply deferred, it was not waived.

Finally, the provision requiring each party to put additional equity into Econergy in the event GFV exercised its option to purchase one-half of Deol's land, does not seem unreasonable, particularly when that additional equity would be used by Econergy to pay down Goel's loan. The sooner the construction loan was paid off, the sooner both Deol and GFV would begin receiving rent payments from Econergy and receiving profits from the plant.

As such, the Loan Agreement was not unconscionable as to Deol either.

### 4. Was the interest rate in the Loan Agreement usurious? If so, what remedy should flow from that fact?

It is undisputed that the 15% interest called for by the Loan Agreement was usurious under California law. The contested issues are: (1) whether the Loan Agreement should be reformed to call for a 10% rate because the parties acted in good faith and intended to select a lawful rate, and, (2) if not reformed, whether Econergy should receive something more than a cancellation of its interest obligation, such as treble damages under C. C. § 1916-3 for any interest it has paid under the Loan Agreement.

The elements of a claim for usury have been stated by he California Supreme Court as follows: "The essential elements of usury are: (1) The transaction must be a loan or forbearance; (2) the interest to be paid must exceed the statutory maximum; (3) the loan and interest must be absolutely repayable by the borrower; and (4) the lender must have a willful intent to enter into a usurious transaction." *Ghirardo v. Antonioli* (1994) 4 Cal.4th 791, 798.

Goel argues that because both parties assumed the agreed-upon interest rate was lawful, and there was no intent on Goel's part to enter into a usurious transaction. As such, Goel asks that the Loan Agreement be reformed to provide for a lawful interest rate (10%), citing to *First American Title Insurance & Trust Co. v. Cook* (1970) 12 Cal.App.3d 592, in which the court reformed a loan agreement to make it non-usurious. Deol opposes reformation.

Goel's argument is rejected. First, the "willful intent" element of a usury claim does not require an intent to violate the law: "The element of intent is narrow. '[T]he intent sufficient to support the judgment [of usury] does not require a conscious attempt,

**PARTIAL FINAL AWARD (CORRECTED)**

**Exhibit A**

with knowledge of the law, to evade it. The conscious and voluntary taking of more than the legal rate of interest constitutes usury and the only intent necessary on the part of the lender is to take the amount of interest which he receives; if that amount is more than the law allows, the offense is complete. (*Thomas v. Hunt Mfg. Co* (1954) 42 Cal.2d 734, 740, 269 P.2d 12.)'." *Ghirardo v. Antonioli, supra*, at 798. See, also, *Abbott v. Stevens* (1955) 133 Cal.App.2d 242, at 249 (if the instrument is plainly usurious on its face, "intent is presumed, implied, or ignored.") and *Denny v. Hartley* (1957) 154 Cal.App.2d 304 at 306 (". . . intent to execute a usurious rate of interest is conclusively presumed from a note or instrument which clearly shows on its face that it is usurious, and no evidence of intent or lack of such intent is required.").

Secondly, there is no clear case authority for the proposition that reformation should be available merely because the parties thought their agreed-upon rate was lawful. See, e.g., the cases discussed in "Reformation of Usurious Contract," 74 A.L.R.3d 1239. The main case relied upon by Goel, *First American Title Insurance & Trust Co. v. Cook* (1970) 12 Cal.App.3d 592, involved a very different situation than ours. In that case a third party scrivener erroneously and inadvertently inserted usurious provisions that the parties had neither requested nor intended. In that situation reformation to delete the unintended language was found proper. In our case, the parties discussed and fully intended to include the 15% interest provision; they just did not appreciate the fact that this provision was usurious. That lack of appreciation does not warrant reformation.

Under Goel's argument, virtually every usurious contract could be reformed to specify the legal rate, as it would be a rare case in which the parties would admit they intentionally selected a usurious rate. As noted by one writer: "An argument can easily be made that it is against public policy for a contracting-party creditor to write loan documents that are on their face usurious and then either collect the usurious interest or, if the debtor objects, collect the maximum interest permitted by law." Expert Series, 2 Cal. Affirmative Defenses at §37:13 "Usury."

As such, the Loan Agreement will not be reformed to call for a 10% interest rate, and thus no interest will be allowed under the Loan Agreement. However, this is not a case in which an award of treble damages under C. C. § 1916-3 is appropriate for whatever interest Econergy may have paid to date.

In sum, Goel will be permitted to recover the outstanding principal balance due under the Loan Agreement ($997,716.00), but without interest. However, that principal balance will be reduced for two credits given to Econergy, as follows:

Econergy is to be given a credit for the PSPCL revenue currently in the Axis Bank account, which amount will be repatriated to Goel in due course. That amount, as of March 31, 2017, was 15,188,169.87 Rupees, or $235,183.80 USD using the exchange rate in effect on June 15, 2017, the day before this Award was first issued [64.58 ₹/$].

Econergy will also receive a credit for the $71,731.04 placed by into Econergy's Morgan Stanley account in early 2013. Although the bulk of those funds apparently were

**Exhibit A**

from the two returned IREDA bank guarantees (and thus part of equity), it is deemed appropriate to now release those funds to Goel, and to give Econergy a credit against Goel's loan for that amount.

As such, the balance due from Econergy to Goel under the Loan Agreement is determined to be $690,801.16, and a partial final award in favor of Prabhakar Goel and against Econergy, Inc. will be entered in that amount below (Section VI).

### 5. Did Goel fail to complete the project in a timely manner?

Despite the fact that Econergy, while under Deol's sole control, took no steps to construct the plant during the first nine months following IREDA approval, Deol now argues that, after the Co-Development Agreement, Goel unreasonably delayed the construction and commissioning of the plant, causing Econergy to forfeit three of its IREDA bank guarantees and lose several months revenue from PSPCL. Specifically, he claims that Goel unreasonably delayed the project by slowly selecting an EPC contractor, slowly funding the project, and then by changing the PV panel manufacturer at the last minute.

Although both parties obviously shared the same financial incentive to complete the plant as expeditiously as possible, the Co-Development Agreement did not set a deadline for completion, and Deol offered no expert testimony on how long it should have taken to build this plant under the conditions then existing in India. There definitely was no persuasive evidence that a plant could have been built in just one hundred days, the time between the Co-Development Agreement and IREDA's one-year point. Indeed, the Staten bid, which Econergy had just received in May 2011, indicated that five months were needed. We also know, from looking at the completion dates for the seventy-one other projects in the initial RPSSGP program, that very few were completed within one year. Only eight made that one-year deadline, and many of the projects were not completed until early 2012, much like Econergy. [#141] Also, we do not know if any of these other projects waited nearly nine months following IREDA approval before even starting construction.

It does appear that Goel required nearly three months to find an EPC contractor. Although he started his search immediately after the Co-Development Agreement and had several prospective EPC contractors tour the plant within days of the Co-Development Agreement, those contractors did not work out, through no apparent fault on Goel's part. And, once again we do not have evidence that it was unreasonable, under the conditions then existing in India, to use ninety days to find a solar EPC contractor who could handle this job and complete it by IREDA's mid-March 2012 deadline. Solar farms were relatively new in India at the time, and over seventy projects were competing for resources. Before liability can be imposed on Goel for his alleged delay, the burden was on Deol to demonstrate that the time frame here either violated Geol's duty of reasonable care as a director (Ca. Corp. Code § 309) or violated the terms of the Co-Development Agreement. For Deol to simply say that Goel should have done it faster, without more, does not satisfy his burden of proof.

**Exhibit A**

Further, once Goel had an EPC contractor on board, the project moved quickly. The PV panels were ordered within days, and TIF's had its plans available in less than ten days following its hire. With those plans in hand, a civil works contractor was hired and materials ordered. Both owners had their on-site agents assisting in the process: Goel had his son Pooneet and Deol had his second cousin Surinder Singh.[27] There was no evidence that they did not work expeditiously to move the project forward once plans were available from TIF.

Additionally, it cannot be said that GFV was slow in funding the project. Before the EPC contractor had been hired and plans drawn, there was little need for funding. The civil works could not start until the site layout and the construction features were known. Similarly, the type and quantity of materials to order were unknown before plans were drawn. And, as soon as the EPC contractor was hired and plans drawn, GFV began infusing money into the project. By October, GFV had put in over $160,000 and had also obtained two short-term loans for another 4,100,000 Rupees (approximately $90,000). There was no evidence that, before the bank-funding crisis in November, any aspect of the construction process had been delayed due to a lack of funds. Also, although GFV did not immediately put in its full initial equity of $212,745, the Co-Development agreement had not placed a deadline for making that contribution (only the later Loan Agreement did that). There was no convincing evidence that the timing of GFV's equity infusions caused project delay.

Also, there was no evidence that Goel was deficient in his efforts to obtain bank funding for the construction costs. Goel and Deol were both attempting to find commercial financing, as was Vijay Goel, Econergy's C.A. Unfortunately, their efforts were not successful. However, this was not shown to have resulted from a lack of effort by any party. And, the absence of commercial funding did not become critical until late October or early November, at which time the parties discussed whether, because of this unanticipated funding crisis, the project should continue.

As to Deol's claim that Goel caused delay by his last-minute change in the vendor for the PV panels, that claim is rejected. It was Deol, in December of 2011, who initiated the discussion of whether the NexPower panels might be less expensive. In response, Goel asked TIF whether such a change was possible at that late stage. TIF said that it could be done, but would require design changes because the NexPower panels produced greater wattage and thus fewer were needed, which meant other structural changes were needed, too. At that point, Goel gave the approval for the change. However, irrespective of which party initiated the panel-change discussion, both agreed to make that change, and both bore equal responsibility for any delay that change may have caused.

Deol also argues that Goel was slow in advancing construction money under the Loan Agreement. However, the Loan Agreement called for Goel to advance funds "as

---

[27] Neither of these were paid for their work by Econergy. This may be because, under Paragraph 10 of the Co-Development agreement, neither the directors nor their employees were to be paid, absent an agreement of all directors.

**PARTIAL FINAL AWARD (CORRECTED)**

**Exhibit A**

requested by [Econergy]" "to service cash needs as they arise." We know that the Loan Agreement was entered into at the very end of November, and that Econergy had just received well over $600,000 of additional equity from the owners. Six weeks later, Goel advanced nearly three-quarters of a million dollars ($724,716). Without knowing when the $600,000 of additional equity was exhausted, it is not possible to know when Econergy next experienced "cash needs" or whether Goel unreasonably delayed in responding to those needs. In short, Deol has not shown that Goel delayed the completion of the project by the speed at which he met Econergy's construction cash needs under the Loan Agreement.

It should also be noted that, under the Co-Development agreement, it was not GFV's obligation to fund, *on a long-term basis*, the 70% or 80% of project costs that was expected to come from a commercial lender. The two owners (Deol and GFV) had anticipated putting in only 20% to 30% of the construction costs from their own money (i.e., the $812,745 called for by the Co-Development Agreement) and then securing the remaining $1.5 to $2 million commercially. Although the Co-Development Agreement did require GFV to make *short-term* loans as needed, it did not require GFV to assume the role of a long-term commercial lender in the event a commercial lender could not be found. Obviously, it would not have helped Econergy if, in November of 2011, GFV had lent Econergy the $1.6 M on a *short-term* basis; Econergy never would have been able to repay that amount in the short term.

In sum, Deol has not established that Goel unreasonably delayed the completion of the project.

### 6. Did Goel fail to execute the project "per IREDA and PEDA requirements"?

Deol argues that Goel breached the Co-Development Agreement because he did not execute the project per IREDA and PEDA requirements. He bases this argument on the assertion that TIF did not properly ground the panels, in violation of IREDA's specifications.

When the project was completed, TIF certified that the plant met all IREDA requirements. Also, PEDA and IREDA conducted detailed inspections before approving and commissioning the plant. And, neither agency has revoked or threatened to revoke their approvals based on any later-discovered construction defects.

Deol nonetheless argues that despite TIF's certification, and PEDA's and IREDA's approvals, the plant did not meet IREDA's requirements, as the frames for the panels were not properly grounded, causing a potential shock hazard and causing TCO corrosion in some of the panels. Because the PEDA and IREDA requirements include proper grounding measures, Deol asserts that Goel did not live up to his contractual obligation to "execute the project per PEDA and IREDA guidelines."

Deol, in making this argument, misinterprets the Co-Development Agreement.

**PARTIAL FINAL AWARD (CORRECTED)**

**Exhibit A**

That Agreement made Goel "responsible for execution of the project per IREDA and PEDA requirements" and Goel satisfied that responsibility by obtaining the certificate of compliance from TIF followed by the approvals from PEDA and IREDA, all of which allowed the plant to be commissioned and connected to the grid. The plant has now been producing for over five years, and there is no indication that either PEDA or IREDA has any concerns over compliance with their technical requirements.

Even if Deol is correct in his argument that TIF did not properly ground the panels, there is no evidence that Goel was aware of that fact when he received the certificate of compliance from TIF or the approvals from PEDA and IREDA. Goel's job under the Co-Development Agreement was to see to it that the plant was built, and was approved by PEDA and IREDA. He did that.

If it later turned out that, despite its representation of compliance, TIF had not properly grounded the panels, TIF would be liable for that defect, not Goel. Under the Co-Development Agreement, Goel did not occupy the position of a general contractor, nor was he the guarantor of TIF's work. As one of Econergy's owners, he hired TIF as the EPC contractor, and there was no evidence that Goel was negligent in making that selection, or that he had any reason to question the accuracy of TIF's representation of compliance, or question PEDA's and IREDA's certification of the plant.

Obviously, if Goel had failed to obtain a certificate of compliance from TIF, or if the plant had failed certification by PEDA or IREDA, he would not have satisfied his contractual obligation to execute the project per PEDA and IREDA requirements. Here, however, he obtained the required approvals, in good faith, and the plant was commissioned and has been in operation for five years. It cannot be said that Goel breached the Co-Development Agreement because alleged construction defects, unbeknownst to him, may later have been discovered.

Also, as to the production numbers, no particular level of plant output was required for PEDA's and IREDA's certifications, and Goel did not represent to PEDA or IREDA that a particular level of production would be achieved. As such, it cannot be said that Goel failed to execute the project "per PEDA and IREDA requirements" simply based on the level of power output.

### 7. During construction, did Goel misappropriate Econergy's materials for use on his other projects?

Deol claims that Goel misappropriated some of Econergy's materials, particularly structural steel and cables, for use in his other projects, without proper reimbursement to Econergy. He bases this claim on the fact that, after the December 2011 plant redesign, Econergy did not need all the steel and all the cables that had been ordered, and Goel transferred some of the excess to his other projects. Deol believes that Econergy was not fully compensated for these reassigned materials. Although the dollar amount involved on this issue is relatively modest, the documentation regarding the disposition of the steel

PARTIAL FINAL AWARD (CORRECTED)

**Exhibit A**

and the cables appears to contain some inconsistencies, and thus an accounting of these items will be ordered (see Section VI, below).

### 8.  Was Goel deficient in his director duties by making the decision to abandon the custom-made riveted nuts[28] at the German airport?

Deol faults Goel for making the decision to abandon the custom-made riveted nuts after the change in panel manufacturer. However, this decision appears to have been an appropriate business decision, as Econergy had no use for them, and there was no evidence that they had any resale value. As such, Goel's decision to avoid the airfreight expense, and avoid the need to store useless parts at the Ludhiana plant, was a reasonable business decision.

### 9.  Did Goel misallocate the work time of the shared project personnel?

Deol also complains that Goel made an inappropriate apportionment of Niraj Mehta's and Rajeev Ranjan's time between Goel's various projects, and thus he has caused Econergy to reject the costs allocated to it for these workers.   On what information Deol bases his objection is not exactly clear, as he was not on-site from August of 2011 through January or February of 2012, and not in a good position to determine how much time the two spent at the Ludhiana site. In any event, Goel's allocation formula is deemed reasonable and not in breach of any duty he owed to Econergy, and thus Econergy is to pay the amount allocated to it for these individuals' time.

### 10.  During construction, did Goel fail to act in a consensus manner with Deol?

Deol complains that Goel did not always act in a consensus manner during the construction process, and that he made certain decisions on his own. Deol is correct that the Co-Development Agreement generally called for the two directors to act on a consensus basis with respect to corporate mtters. However, the Agreement also gave Goel the task of getting the plant built, and specifically gave him the authority to "negotiate with vendors and contractors for completion of the project." Under normal rules of contract interpretation, this specific clause (giving Goel control over dealings with vendors and contractors) would take precedence over the general shared-governance clause.

Also, although both Deol and Goel were residents of Northern California, they each travelled extensively during the construction phase, and not just in India. Indeed, neither spent extensive time on site during construction, although Goel was there more than Deol. Most of their communications during the construction phase were by email; as such, we have a fairly extensive record of their interactions during that time, including the emails of Pooneet Goel, who was on-site for Goel. Looking at the emails, it does not

---

[28] The record is somewhat unclear as to whether the items were riveted nuts or riveted bolts, or both. For our issues, however, the exact nature of the items is immaterial.

**Exhibit A**

appear that Goel, or his son, failed to keep Deol apprised of construction progress, or avoided Deol's input on major matters, such as whether to change the panel supplier.

As for Goel's selection of TIF as the EPC contractor, it appears that Goel may have made that selection without first seeking Deol's input. However, TIF was not unknown to Deol before being selected as the EPC contractor. In January of 2011, Goel had recommended TIF's services to Deol, and TIF was designated as the plant's designer in Staten's May 2011 EPC proposal to Econergy. [#1618] And, there was no evidence that Deol, even if he had been consulted in August of 2011 about TIF's hiring, would have voiced a negative opinion or would have suggested that Goel continue his search for an EPC contractor.

Even if Goel did not always act by consensus during the construction process, it is hard to determine how Deol was damaged. Indeed, involving Deol in every decision likely would have delayed the project, given Deol's busy travel schedule and his health issues. And, Goel brought the project to completion before the final IREDA deadline and did so under the anticipated cost.

### 11. Was Goel at fault if the plant produced below the parties' expectations?

Deol also argues that Goel should be held personally responsible for the fact that the plant's power output was below expectation. He argues that because Goel was responsible for getting the plant built, he should be responsible for its performance.

In 2012, the plant performed at about 25% below expectations, but then improved greatly in 2013, when production was only 13% below expectations. And, this plant's production is not out of line with the other 1MW plants constructed under the initial RPSSGP program. [#1813] Nonetheless, Deol believes Goel should be held responsible, in the form of past and future monetary damages, for any production levels that are below TIF's pre-construction projections.

However, Goel never made representations as to anticipated output, and specifically did not guarantee a particular output. Also, there was no persuasive evidence that the Ludhiana plant, as built, does not qualify as a "1 MW solar plant," and its output does not appear to be out of line with the other 1 MW plants operating in Punjab under the RPSSPG program. [#1813]

At the start of its work on this project, TIF made a projection of plant output by using the "PVsyst" computer simulation program. That projection, however, was not a guarantee by TIF of a specific performance level, and Goel did not warrant a specific output level. As noted, there was no evidence that PEDA or IREDA considers this plant as not meeting its requirements for a 1 MW plant. And, of course, Deol is not the only party affected by the alleged under-performance; any diminished revenue falls equally on both owners. In short, Goel cannot be held to have personally guaranteed a particular level of production from this plant.

**Exhibit A**

## 12. Did Goel properly perform his duties, as a director, in response to the plant performance issues that arose in 2012?

Deol argues that Goel did not adequately perform his duties, as a director, in response to the power output issue. In making this argument, Deol basically is saying that Goel was deficient in his duties because he and Deol did not agree on the cause of the power reduction, or the remedies Econergy should pursue. Specifically, by late 2012, Deol became convinced that the reduced power output was the result of TCO corrosion in some of the panels, and that this TCO corrosion was the result of inadequate grounding of the panels by TIF. Goel, on the other hand, was not convinced there was improper grounding, and attributed the 2012 production numbers to deficient plant maintenance (by Deol's on-site people) and to defective panels from NexPower. TIF's owner, Klaus Müller, agreed with Goel; Müller's two post-commissioning visits in 2012 revealed a number of operations and maintenance deficiencies, such a dirty panels, blown fuses, and corroded parts.[29] Müller was also of the opinion that the NexPower panels themselves were defective, allowing moisture intrusion that resulted in TCO corrosion.

In 2012 and early 2013, the two directors discussed these matters, and debated the actions Econergy should take. Deol wanted to pursue TIF; Goel was opposed. Econergy put in a warranty claim with NexPower for the TCO corroded panels, but this was rejected because NexPower maintained that the panels had not been properly grounded. Goel disagreed with NexPower's assessment, but also felt it was unproductive to pursue NexPower in arbitration, which would have taken place in Taiwan. Deol, at a point, accused Goel of having a conflict of interest with regard to pursuing TIF; in response, Goel voluntarily recused himself from any further decision regarding actions against TIF.

In essence, Deol's claim is that Goel was deficient in his duties as a director of Econergy in 2012 and 2013 because he had concluded that the TCO corrosion was due to defective NexPower panels and that this, combined with poor maintenance, was causing the production issues. Deol also faults Goel for not recommending that Econergy pursue TIF (at least in the time frame before Goel recused himself on that decision) and for recommended against pursuing NexPower in arbitration in Taiwan.

However, it cannot be said that Goel was deficient in his duties as a director of Econergy in reaching his conclusions on the production issues in 2012 and early 2013. He based his conclusions on the then-available evidence, as well as his own knowledge as an electrical engineer. Under Corp. Code § 309, he cannot be held liable to the corporation just because another director disagreed with his conclusions or if his conclusions are ultimately found to have been in error. What is required is that he serve "in good faith, in a manner such director believes to be in the best interest of the corporation and its shareholders and with such care, including reasonable inquiry, as an

---

[29] Interestingly, after improvements in maintenance were implemented, power production increased, and in 2013 was only 13% below expectations.

PARTIAL FINAL AWARD (CORRECTED)

**Exhibit A**

ordinarily prudent person in a like position would use under similar circumstances." Goel met this standard.[30]

### 13. Did either Goel or Deol fail to meet their obligations regarding obtaining a CLU for Deol's land?

Both Deol and Goel contend that the other breached the Loan Agreement by failing to obtain a change in land use (CLU) for Deol's land.

By September of 2011, the two directors realized that, despite Deol's prior representations to the contrary, a CLU was needed for the plant to be a lawful land use. As such, Deol, as the landowner, applied for that CLU on October 2, 2011. Then, because he had not completed this task by the time of the Loan Agreement, and because plant commissioning was due in ninety days, the Loan Agreement required him to obtain it within sixty days. Also, as the parties planned to replace Goel's construction loan with a longer-term bank loan, they knew a CLU would be required by any commercial lender.

Additionally, the Loan Agreement required Deol to give Goel a full power of attorney over Deol's land, so that Goel could obtain the CLU in the event Deol was unable. Deol, however, did neither: he did not obtain the CLU in 60 days, and did not give Goel the power of attorney that would have enabled Goel to obtain one.

Some seven months after the Loan Agreement, when GFV exercised its option to purchase one-half of the land, Deol still did not have the CLU. Goel, not being the landowner and not holding a power of attorney from the landowner, had no ability to obtain that CLU. And, every time Goel inquired as to the status of the CLU, Doel had an excuse as to why it had not been obtained.

It appeared that, after GFV's exercise of its option, Deol simply did not want to part with one-half of his land and was using the CLU as a means to avoid that sale. Indeed, at one point, he told Goel the he did not want to part with the land because it had sentimental value and on another occasion that it was worth more than the agreed-upon price. Deol then blamed the delay in obtaining the CLU on Goel, arguing that Goel should have asked him for the power of attorney.

By not obtaining the CLU, and not giving Goel a power of attorney, Deol not only delayed GFV's purchase of one-half of the land, but also caused Econergy to operate illegally for several years (at least until late 2014, when Deol apparently obtained a CLU

---

[30] At the end of 2013, after their discussions had concluded, Deol received a report from a third party, GenSol, opining that the panels had been inadequately grounded. In response to that report, Deol added additional grounding in 2014. That work did not improve the plant's output; however, according to Deol, it did cut down on shocks to workers and did "stabilize" plant production. The information from GenSol was not part of the information available to the two directors when they discussed plant production issues in 2012 and 2013. Also, for whatever reason, Deol did not have Econergy pursue TIF for the expense of the additional grounding.

PARTIAL FINAL AWARD (CORRECTED)

**Exhibit A**

[#301]). Deol's delay in obtaining the CLU not only prevented GFV from acquiring one-half of the land, but also prevented Econergy from receiving an additional nearly $600,000 of equity to pay down the loan from Goel.

In sum, Deol breached the Loan Agreement by not timely obtaining a CLU, and by not giving Goel a power of attorney to do so.

### 14. Did either party breach its obligations under the option to purchase after GFV exercised that option?

Similarly, both GFV and Deol claim that the other breached their contractual obligations following GFV's exercise of its option to purchase one-half of the land. On this issue, too, Goel has the better argument, as it is clear that the only reason the sale did not take place was because Deol did not want to honor the option and thus did not obtain the needed CLU.

In late 2012 and into 2013, GFV was ready, willing, and able to complete its purchase and repeatedly asked Deol to obtain the CLU so that sale could proceed; Deol resisted and delayed. As noted above, it appeared that Deol simply did not want to part with the land, and used various excuses for not following through on the sale. Then, in early 2013, he told Goel that the land transfer was now "moot" because he was unhappy with Goel's accounting of the plant's construction costs.

As will be discussed below, Deol's concerns over the accounting issues were not a valid excuse for his failure to honor his obligations under the option. Deol clearly breached the option agreement.

### 15. Did Deol adequately account for the $31,000 of claimed expenses for which he received a credit against his equity requirement?

Under the Loan Agreement, the two owners were to promptly complete their remaining equity contributions called for by the Co-Development Agreement. Deol was to contribute an additional $306,000; however it was agreed that he initially would contribute only $275,000 and then account, by December 31, 2011, for $31,000 of expenditures he had made between June 7th and November 28th, 2011. If the documented expenditures did not total $31,000, he was to make up the difference at that time.

Deol did not render any accounting by December 31, 2011. Some nine months later, on September 24, 2012, Surinder Singh gave Goel a listing of claimed cash expenditures through that date, with some receipts included.[31] [#1694] However, two of the larger claimed expenditures were incurred *before* the making of the Co-Development Agreement and Doel has already been compensated for these expenses by way of his "deemed equity."

---

[31] Also, more than a year after the December 31, 2011, deadline (in February of 2013), Deol listed expenditures he claimed for 2012 and for the first two months of 2013 [Exh. 131], but this listing does not include any expenses incurred in the June 7th to November 28th, 2011, timeframe.

**Exhibit A**                    PARTIAL FINAL AWARD (CORRECTED)

With the removal of the two expenses that predated the Co-Development Agreement, Deol's accounting reveals that he expended 1,407,521 Rupees or $26,527 USD using the December 31, 2011, exchange rate [53.06 ₹/$]. As such, Deol is hereby ordered to pay to Econergy the balance due on his equity contribution, i.e., $4,473.

### 16. Is Deol liable to Econergy for the interest received on the IREDA bank guarantees?

The five bank guarantees represented equity contributions, either from Deol as part of his deemed equity, or from Geol as part of the $87,500 he forwarded to Deol in August of 2010 (which was acknowledged in the Co-Development Agreement as an equity contribution). Any interest earned on Econergy's equity would belong to Econergy. Deol has neither accounted for, nor delivered to Econergy, the interest earned on these bank guarantees and he will be ordered to do so, below.

### 17. Did Goel fail to adequately account to Econergy and Deol for construction costs and for the advances Goel made under the Loan Agreement?

Although Goel completed this project for significantly less than originally anticipated by Deol, and although Deol has presented no evidence of financial wrongdoing by Goel during the construction process, Deol nonetheless complains that Goel has not adequately accounted for the construction costs, including not adequately documenting advances made under the Loan Agreement and for expenditures during the construction process. However, other than as to the records for the purchase and reallocation of the structural steel and the cables (for which a further accounting will be ordered), this claim is rejected; the records and accounting furnished by Goel are deemed adequate and appropriate for this project.

### 18. Was Deol justified, because of any of Goel's actions, in taking the actions he took beginning in March of 2013, to take control over Econergy and cause Econergy to default on its loan payments to Goel?

It was clear that, by the Spring of 2013, Deol was unhappy with his earlier decisions regarding ownership and control of Econergy and wanted to take control of the corporation by excluding co-owner GFV, disavowing the construction loan from Goel, and diverting the monthly payments from PSPCL from the lender's account to a new account under this control. Although Deol's unhappiness with his prior decisions may have been understandable,[32] his actions clearly were unjustified and wrongful.

To accomplish his takeover of the corporation, he (1) fired the corporate accountant and took the corporation's financial affairs to the accountant who had

---

[32] The corporation that originally was solely Deol's was now co-owned and co-controlled by another entity. GFV. Deol was also being required to sell one-half of his land to that other entity and, until the construction loan was paid off, Deol was not receiving any rent for his land and was not receiving any profits from the plant.

**Exhibit A**

originally set up Econergy's Indian Project Office; (2) did not tell that accountant that the corporation was now co-owned and co-controlled; (3) did not tell that accountant that the corporation had borrowed nearly one million dollars for construction of its plant; (4) stopped depositing the monthly revenue payments from PSPCL into the "lender's account" at AxisBank; (5) opened a new account into which he deposited the plant revenue; (6) "accidentally" transferred some of Econergy's revenue to another of his Indian solar projects; (7) told Goel that the sale of one-half of the Ludhiana land was now "moot," and (8) instructed his U.S. accountant, when preparing Econergy's 2012 U.S. tax return, that he now was the 100% shareholder (despite the fact that the 2011 return had correctly shown GFV as a 49% shareholder).

In executing his takeover, Doel chose to ignore the fact that Goel had completed the project well under anticipated costs, and that without Goel's willingness to lend Econergy up to $1.6 million of his personal funds, the project likely would have gone under in late 2011 through no fault of either director. He also has chosen to ignore the fact that if he had promptly obtained the CLU, and had honored GFV's exercise of the option to purchase, much of Econergy's debt would have been paid off long ago. He also seems to discount the fact that, in 2013, the plant was performing better than in 2012, apparently due to improved maintenance.

The "justification" that Deol gave for his 2013 take-over was that he was dissatisfied with Goel's "plant accounting," and that he and Goel disagreed over why the plant was producing less electricity than expected and over remedies to pursue. In the course of this arbitration, Deol has raised many additional claims of purported wrongdoings by Goel, all offered as additional justification for his actions in 2013. These claims have been discussed above and, as seen, have been rejected as unsubstantiated, overblown, or simply wrong.

Deol, as an experienced businessperson with access to quality legal advice, knew he had appropriate ways to deal with his concerns in March of 2013. If dissatisfied with Goel's accountings to date, he had every right to obtain a full neutral accounting of Goel's handling of corporate financial affairs. And, as to any director deadlock over the remedies to pursue on the plant production issue, seeking the appointment of a third director to break that deadlock was always available.

Importantly, too, even if the construction accountings rendered by Goel in 2012 and 2013 did not meet Deol's expectations, a further and complete accounting had little to do with Econergy's obligation to repay its loan. Deol knew that, as of May 2013, the first year's PSPCL revenue in the lender's account at Axis Bank totaled less than $275,000 USD. And, he knew that this was nowhere near the amount of Goel's outstanding loan. Even if Deol truly distrusted the loan records he had received from Goel, Deol himself had estimated that construction costs for this plant would be $2M to $3M, and he knew that the two owners, collectively, had put in equity of only $812,745.[33] He knew that the remainder of the construction money had come from one source: Goel's

---

[33] After entering into the Co-Development Agreement, Deol put in $306,000 (if one includes his $31,000 of claimed expenses) and Goel put in $506,745 ($212,745 plus $294,000), for a total of $812,745.

PARTIAL FINAL AWARD (CORRECTED)

**Exhibit A**

loan. Deol simply had no reasonable basis to think that Econergy might somehow over pay on Goel's loan.

Also, there was no urgency to any of Deol's concerns in mid-2013. At most, there were minor accounting matters that needed to be finalized and a decision made regarding which remedies to pursue on the plant performance issue. Seizing the corporation and diverting the plant's revenues were not among Deol's lawful options for dealing with those concerns.

### 19. Following the events of early 2013, has Deol engaged in actions that violated his fiduciary duties to Goel and to Econergy?

Subsequent to his takeover, and except when challenged by Goel's attorneys or ordered by the undersigned, Deol appears to have continued to treat Econergy as a solely owned business and his personal funding source.

Following Deol's takeover, Econergy has received over four years of revenue from PSPCL, amounting to more than $1 million dollars.[34] Annual operating costs for the plant were estimated to be approximately 1M Rupees (less than $25,000/year), and Econergy has paid no rent and made no payments on its construction loan during those four years. In short, Econergy should have accumulated a substantial sum during that time.[35]

Yet, Deol apparently now claims that the corporation has no funds. However, he has moved Econergy funds to other bank accounts within his exclusive control, both in India and the U.S., and in the past has transferred Econergy's money to one or more of his other solar ventures. As such, a full accounting of Deol's activities involving Econergy for the past four years is needed. Obviously, any misappropriated funds will be ordered returned to Econergy, with interest, and with sanctions where appropriate. Also, as part of that accounting Deol will be ordered to provide copies of any and all documents filed by, or on behalf of, Econergy with any other entity, public or private, whether in India, the U.S., or elsewhere

/ / / / / / /

/ / / / / / /

/ / / / / / /

---

[34] The plant has produced at least 1.1M kwhs each year. With the guaranteed tariff of 17.91 Rupees per kwh, the plant has received revenue from PSPCL of approximately 80 million Rupees since Deol's takeover.

[35] As Deol's wrongful actions caused Goel to institute arbitration proceedings, that fact will be taken into consideration when determining who should be held responsible for the legal expenses incurred by Econergy over the past three and one-half years.

## VI. RELIEF ORDERED IN THIS CORRECTED PARTIAL FINAL AWARD

Based on the above findings and conclusions, a Corrected Partial Final Award is hereby entered as follows:

### 1. Remedies For Econergy's and Deol's Breach of the Loan Agreement:[36]

#### a. For Econergy's Breach of the Loan Agreement:

As of July 1, 2016, Goel's loan to Econergy had fully matured, with the outstanding balance due and owing at that time: "The unpaid portion of the principal amount of the loan will be paid as a balloon payment after 48 months from July 1, 2012." [Loan Agreement at §2.5.2.] Econergy then defaulted by not paying the outstanding balance within ninety (90) days of that maturity date, i.e., by October 1, 2016. [Loan Agreement at §2.5.3]

The amount advanced by Goel to Econergy under the Loan Agreement was shown to be $997,716. However, as noted above, Econergy will be granted a credit for the PSPCL revenue currently held in the Axis Bank account, i.e., 15,188,169.87 Rupees or $235,183.80 as of the June 15, 2017, exchange rate [64.58 ₹/$]. Econergy is also granted a credit for the $71,731.04 placed into Econergy's Morgan Stanley account in early 2013, and those funds may now be transferred to Goel as a partial repayment of loan principal.

As such, the unpaid loan principal is determined to be $690,801.16 and a Partial Final Award is hereby entered in favor of Prabhakar Goel, an individual, and against Econergy, Inc., a California corporation, for that amount.

As the funds in the Axis Bank account have not yet been repatriated, Deol and his agents, servants and employees, are hereby ordered to take no action to encumber, reduce, or in any way diminish or devalue the funds currently in the Axis Bank account, and they are ordered to cooperate fully in the repatriation of these funds to Goel in the United States.

#### b. For Deol's Breach of his Guarantee under the Loan Agreement:

As noted, irrespective of the money placed in the Axis Bank account in 2012 and 2013, and the money placed in the Morgan Stanley account in 2013, Econergy was in default under the Loan Agreement as of October 1, 2016. As such, under the provisions

---

[36] Having determined that Goel has no individual liability to Deol on any of Deol's claims, and that Goel's only possible liability is to Econergy on a very minor issue (the steel and cables issue, which issue can be handled as part of the later overall accounting), the amount of both Econergy's and Deol's obligations under the Loan Agreement will be determined at this juncture, and relief ordered, apart from the parties' other liabilities, most of which will require a further accounting by an independent accountant.

of his personal guarantee, Deol became liable at that time for prompt payment of 51% of that outstanding balance: " . . . Borrower and Guarantor will be respectively liable for prompt payment and Lender will be entitled to invoke any and all guarantees and possess any and all collateral provided as Security . . ." [Loan Agreement at §2.5.3).

Deol has made no payment to Goel under his personal guarantee, and thus a Partial Final Award is hereby entered in favor of Prabhakar Goel, an individual, and against guarantor Jaspal Singh Deol, an individual, in the amount of $352,308.59 (51%, of Econergy's current obligation under the Loan Agreement, as determined above).

Although Goel is also entitled, under the Loan Agreement, to immediate possession of the security for Deol's guarantee (Deol's Econergy shares and his land under the plant), Deol will be granted thirty days to make good on his personal guarantee, if he wishes to avoid a surrender of the pledged security. If the sum of $352,308.59 is paid within thirty days of the date of this Corrected Partial Final Award, Deol will be deemed to have satisfied his personal guarantee, and will not be required to turn over the pledged security. However, if this sum is not paid within thirty calendar days of the date of this Corrected Partial Final Award, Deol is ordered to immediately transfer to Goel the pledged security, i.e., his shares in Econergy and the land on which the plant is located. Deol shall be responsible for any costs associated with making those transfers. Goel shall cooperate in these transfers to the extent his cooperation is needed for Deol to effectuate them.[37]

Also, pending further order of the undersigned, Deol and his agents, servants, and employees are ordered to not transfer, encumber, hypothecate, or in any way diminish or decrease the value of either of the pledged securities.

Should Deol make good on his personal guarantee, Econergy will receive a credit, as a partial satisfaction of the above Award, for the amount paid by Deol.

### 2. Remedies for the Other Proven Breaches:

#### a. Deol's Liability to Econergy or to GFV:

##### (1) For Deol's Dealings with Econergy's Revenues and Assets:

The undersigned finds it difficult if not impossible to believe that, in the four years following Deol's May 2013 seizure of Econergy, all corporate revenue has been expended on normal and appropriate corporate needs. During those four years, PSPCL payments to Econergy totaled over $1M, and yet Econergy was not paying rent for the land and was not making payments on its construction loan.

---

[37] If these two items of security are transferred to Goel, ultimately Deol will be entitled to receive a credit from Goel to the extent the fair market value of the land and of the shares (measured as of the date each is turned over) exceeds Deol's obligation under his personal guarantee. Any such credit will be determined and ordered as part of any Final Award issued herein.

A full and independent accounting of all of Deol's dealings, financial and otherwise, with or on behalf of Econergy, from May 2013 to date is hereby ordered. That accounting will include, of course, a determination of all PSPCL payments made to Econergy during that time, as well as all other revenue received by Econergy.[38] The accounting will also determine all corporate expenditures during that time (including, but not limited to, payments to Surinder Singh, Sanjay Arora & Associates, Amrita Kaur, and to attorneys for Econergy), the documentation for those expenditures, and will include the accountant's recommendations as to the appropriateness of those expenditures.

The independent accountant will have access to the agreed-upon exhibits from the arbitration hearing.[39] After reviewing those exhibits, the accountant may, but is not required to, request that Deol first render his own accounting of these matters. Also, the accountant may request additional information or documents from counsel. Any such request for additional information shall be directed to the Arbitrator for referral to counsel; if there is a disagreement among counsel as to whether the requested additional information should be furnished to the accountant, that dispute will be heard and resolved by the undersigned.

Ultimately, the accountant will issue a report (or reports) regarding the matters covered by the accounting. Counsel will be given the opportunity to comment, at a hearing, on the accountant's final report(s) and recommendations, before the undersigned makes final decisions regarding the same.

### (2) Deol's Obligation to Pay Econergy $4,473.00 for the Balance Due on his Equity Contribution to Econergy:

As discussed above, the Co-Development Agreement allowed for a second capital call of $600,000, of which Deol was to contribute $306,000. That call was made, but the Loan Agreement allowed Deol to contribute only $275,0000, provided he accounted for the $31,000 shortfall by December 31, 2011.

His accounting needed to document the corporate expenses he paid between the making of the Co-Development Agreement (June 7, 2011) and the time of the Loan Agreement (November 28, 2011). His belated accounting [#1694] revealed a shortfall of $4,473.00 on his $31,000 equity obligation. An award of that amount is hereby entered in favor of Econergy, Inc., against Jaspal Singh Deol, an individual.

/ / / / / / /

---

[38] Deol also contends that, after December 31, 2011 (i.e., after the period covered by the $31,000 of expenditures covered by the Loan Agreement), he has paid additional Econergy expenses from his personal funds. Deol may account to the independent account for these claimed expenditures.

[39] Claimants/Counter Respondents have timely designated exhibits for the accountant to review; Respondents/Counter-Claimants have not designated any additional exhibits for the accountant's review.

**Exhibit A**                     **PARTIAL FINAL AWARD (CORRECTED)**

### (3) For Deol's Obligation to GFV under the Option to Purchase:

If GFV exercised its option to purchase, Deol was obligated to transfer to GFV one-half of his land for $300,000. GFV timely exercised its option in June of 2012, and was ready, willing, and able to perform; Deol, however, did not perform.

If Deol satisfies his personal guarantee, as per §VI 1(b) above, and retains the land, GFV will then have an election of remedies for Deol's breach of the purchase option: GFV may either pursue breach of contract damages or it may request specific performance of its option. That election of remedies shall be made within thirty (30) days of when it is known whether Deol has made good on his personal guarantee and thereby retained the land.

If specific performance is elected, one half of the land will be ordered transferred to GFV, and GFV will then pay to Econergy, as additional equity, the $588,236 called for by the Loan Agreement ($300,000 on behalf of Deol and $288,236 on behalf of GFV to preserve their 51:49 equity ratio), which amount will then be applied to reduce Econergy's outstanding loan balance to Goel.

Should Deol not perform on the monetary portion of his personal guarantee and thus be required to transfer the pledged security to Goel, Deol will no longer be capable of specifically performing the option agreement, and GFV will be limited to a damages remedy.

### (4) For Deol's Obligation to Account to Econergy for any Interest Received on the IREDA Bank Guarantees:

Deol has yet to account to Econergy for the interest he received on the bank guarantees Econergy furnished to IREDA, whether earned during the time they were held by IREDA or after the return of two of the guarantees. He is hereby ordered to render an accounting to the neutral accountant of the sums he received as interest on the bank guarantees, and once the amount is established, to pay that amount to Econergy.

### b. Determining Goel's Liability to Econergy for Steel and Cables:

An accounting of the purchase, delivery, and distribution of the structural steel and cables for the Ludhiana project is hereby ordered, with the assistance of the independent accountant, to determine whether Goel owes any monies to Econergy with regard to those items. If requested by the independent accountant, Goel is to render an initial accounting of the purchase, delivery, and distribution of the structural steel and cables for the Ludhiana project, as well as the payments made to Econergy by any of his other Indian solar projects for those materials.

/ / / / / / /

**Exhibit A**

### 3. Appointment of the Independent Accountant:

Joseph Anastasi of the Berkeley Research Group, LLC, is hereby appointed as the independent accountant to perform the accountings ordered above, and to make report(s) and recommendations to the undersigned. Goel and Deol are to sign the accountant's standard retainer agreement and share equally in the cost of that accountant's work, subject to later reallocation by the undersigned. Counsel and the parties are not to have contact with the accountant other than through the undersigned or as agreed upon by both counsel.

## VII. FURTHER PROCEEDINGS

### A. To Determine Deol's Performance of his Loan Guarantee:

A hearing will be held in thirty days to determine whether Deol has performed his personal guarantee under the Loan Agreement. Should Deol make that $352,308.59 payment, he will not be required to turn over the security for that guarantee, and Econergy will receive a corresponding credit against its obligation to Goel under the Loan Agreement.

If the payment is made, GFV will then have thirty (30) days to elect its remedy (damages or specific performance) for Deol's breach of the land sale option

If the payment is not made, an immediate turn over of the security to Goel will be ordered, and, in that case, GFV will be limited to a damages remedy for Deol's breach of the option to purchase.

Also, if the security is turned over to Goel, Econergy will receive a credit against its obligation to Goel in the amount thereby satisfied under Deol's personal guarantee, i.e., $352,308.59 (assuming the value of the security is equal to, or exceeds, that amount).

### B. Regarding the Status of the Ordered Accountings:

The hearing in thirty days will also include an initial status report from the neutral accountant.

### C. Following Completion of the Accountings:

Once the independent accountant's work is completed, a further hearing will be held to determine the amount(s) due on the following liabilities, which amounts will be set forth in the next Partial Final Award. That next Partial Final Award will also determine whether any of the obligations should be offset against others:

    a. What amounts, if any, Deol owes to Econergy for misappropriated corporate funds after May 2013, and whether interest and sanctions on those sums will

**PARTIAL FINAL AWARD (CORRECTED)**

**Exhibit A**

be ordered. It will also determine whether any of the additional remedies requested by Goel and GFV (see Relief Requested at pages 26 and 27, above) are warranted under our facts;

b.  What amount, if any, Goel owes to Econergy for surplus steel and cables rerouted to Goel's other Indian solar projects;

c.  In the event Deol does not make good on his personal guarantee and the two securities are turned over to Goel, what amount Deol is entitled to receive from Goel as the excess value of those securities, i.e., the extent by which their value exceeded Deol's obligation ($352,308.59) under his personal guarantee;

d.  Whether Deol is entitled to a credit against his obligations to Econergy for having paid, out of his personal funds, corporate expenses after January 1, 2012, and, if so, the amount of that credit.

e.  The amount of deferred rent Deol is entitled to recover from Econergy;

f.  The amount, if any, that Deol owes to GFV as breach of contract damages resulting from Deol's non-performance of the land purchase option (if specific performance of that option is not ordered);

g.  What amount, if any, Deol owes to Econergy for interest received on the IREDA bank guarantees;

h.  The amount Deol and/or Econergy should pay to Rajeev Ranjan and Niraj Mehta for work performed and for work-related expenses at the Econergy site;

i.  Any other liabilities and damages not previously ruled upon; and

j.  Which party or parties are deemed the prevailing parties in this arbitration and entitled to claim attorneys' fees and costs under the provisions of the Co-Development Agreement and the Loan Agreement, and JAMS Rules.

Dated: June 21, 2017.

Hon. Robert A. Baines
Judge of the Superior Court (Ret.)
Arbitrator

**Exhibit A**

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Goel, Prabhakar vs. Econergy, Inc., et al.
Reference No. 1110016365

       I, Michelle Penuliar, not a party to the within action, hereby declare that on June 21, 2017, I served

the attached Partial Final Award (Corrected) on the parties in the within action by Email and by depositing true

copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at San

Jose, CALIFORNIA, addressed as follows:

Robert J. Yorio Esq.
Christine Watson Esq.
Carr & Ferrell, LLP
120 Constitution Drive
Menlo Park, CA  94025
Phone: 650-812-3400
yorio@carrferrell.com
cwatson@carrferrell.com
   Parties Represented:
   Prabhakar Goel

Kathleen E. Finnerty Esq.
Finnerty Law Offices, Inc.
1430 Blue Oaks Blvd.
Suite 250
Roseville, CA  95747
Phone: 916-415-7070
KFinn@KFinnertyLaw.com
   Parties Represented:
   Econergy, Inc.
   Jaspal Singh Deol

       I declare under penalty of perjury the foregoing to be true and correct. Executed at San Jose,

CALIFORNIA on June 21, 2017.

Michelle Penuliar
mpenuliar@jamsadr.com

**Exhibit A**